PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-1397
_____

JASWINDER SINGH,
on behalf of himself and all those similarly situated,

v.

UBER TECHNOLOGIES INC

Jaswinder Singh,
Appellant
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. Action No. 3-16-cv-03044)
District Judge:  Honorable Freda L. Wolfson
_____

Argued April 26, 2019

Before: GREENAWAY, JR., SHWARTZ, and PORTER,
*Circuit Judges*.

(Filed: September 11, 2019)
_____

Daniel A. Horowitz
Matthew D. Miller
Justin L. Swidler [ARGUED]
Swartz Swidler
1101 Kings Highway North
Suite 402
Cherry Hill, NJ 08034
        *Attorneys for Appellant*

Theodore J. Boutrous, Jr.
Samuel E. Eckman
Theane D. Evangelis [ARGUED]
Gibson Dunn & Crutcher
333 South Grand Avenue
Los Angeles, CA, 90071

Joshua S. Lipshutz
Gibson Dunn & Crutcher
1050 Connecticut Avenue, N.W.
Washington, DC 20036

Paul C. Lantis
William J. Simmons
Littler Mendelson
1601 Cherry Street
Suite 1400, Three Parkway
Philadelphia, PA 19102
        *Attorneys for Appellee*

————————————

OPINION OF THE COURT

————————————

GREENAWAY, JR., *Circuit Judge*.

Arbitration agreements are essentially contracts that predetermine that a dispute between parties will be decided by an arbitrator, rather than in court. In response to judicial hostility toward these types of contracts, Congress passed the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16. The FAA places certain arbitration agreements on equal footing with all other contracts by requiring courts to enforce such agreements according to their terms. Section 2 provides that the FAA covers "a written provision in any maritime transaction or a contract evidencing a transaction involving commerce," *id.* § 2, but a provision in § 1 sets an outer limit, providing that "nothing" in the FAA "shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce," *id.* § 1 ("§ 1"). This outer limit sets the stage for the case before us.

Jaswinder Singh brought this putative class action in the Superior Court of New Jersey, Monmouth County, on behalf of himself, and other similarly situated New Jersey Uber drivers. He alleged that Uber Technologies, Inc. ("Uber") misclassified them as independent contractors as opposed to employees, which resulted in their being deprived of overtime compensation, and having to incur business expenses for the benefit of Uber. Uber removed the case to federal court in the District of New Jersey. It then moved for the District Court to dismiss the case and compel Singh to have it decided by an arbitrator, on the basis of an agreement to arbitrate. Singh opposed the motion to compel arbitration on numerous grounds, one of which was that the District Court did not have the authority to compel arbitration under the FAA. He argued that, to the extent that he had an agreement with Uber, it fell

3

within the ambit of the residual clause—the "any other class of workers" portion—of § 1. In the least, Singh asked that he be given the opportunity for discovery on the essential § 1 residual clause inquiry, which is whether the class of workers to which Singh belongs is "engaged in foreign or interstate commerce." *Id.*

The District Court granted the motion over Singh's objections. But it did not reach the engaged-in-interstate commerce inquiry. Instead, the Court ruled that Singh did not fall within the ambit of the residual clause of § 1 because that clause only extends to transportation workers who transport goods, not those who transport passengers. We disagree with this reading. Consistent with our longstanding precedent, we hold that the residual clause of § 1 may extend to a class of transportation workers who transport passengers, so long as they are engaged in interstate commerce or in work so closely related thereto as to be in practical effect part of it. We will therefore vacate the District Court's order compelling arbitration. In addition, because neither the Complaint nor incorporated documents suffice to resolve the engaged-in-interstate-commerce inquiry, we will remand this and the remaining issues to the District Court for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Legal

The FAA "place[s] arbitration agreements on equal footing with all other contracts" by requiring courts to "enforce [such] agreements according to their terms." *McDonald v. Cashcall, Inc.*, 883 F.3d 220, 226 (3d Cir. 2018) (first alteration in original) (citations omitted). So the statute

4

provides that, like any other contract, arbitration agreements may be rendered unenforceable by grounds that exist at law or in equity for revocation. *See id.*; 9 U.S.C. § 2. To the extent that a particular ground implicates the threshold question of whether the parties are bound by an agreement to arbitrate, it is referred to as a gateway question of arbitrability and is typically resolved in court. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002); *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746, 756 (3d Cir. 2016).

Although this is the typical route, the parties may contract around it, and agree to have even these questions decided by an arbitrator. To do so, the arbitration agreement need only include a clause—a delegation clause—that reserves arbitrability questions for an arbitrator to decide. *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 70, 72 (2010) ("*Rent-A-Center*"). Where such a clause is included, courts cannot decide threshold questions of arbitrability "unless a party challenge[s] the delegation clause [specifically] and the court concludes that the delegation clause is not enforceable." *MacDonald*, 883 F.3d at 226 (citations omitted). The rationale is that a delegation clause is severable from the underlying arbitration agreement such that it is separately entitled to FAA-treatment—that is, unless specifically (and successfully) challenged, the clause is in and of itself treated as a valid contract that must be enforced under the FAA's enforcement provisions. *See Rent-A-Center*, 561 U.S. at 72.

All of this, of course, assumes that the FAA controls. But what if it does not? Or, more precisely, who gets to decide the question of whether the FAA applies where there is a delegation clause? During the pendency of this appeal, the Supreme Court answered this question, holding that courts must be the ones to determine whether an agreement is

5

excluded from FAA coverage even where there is a delegation clause. *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 538 (2019).

Specifically, §§ 1 and 2 of the FAA identify the subset of arbitration agreements covered by the statute. Since they come before the FAA's enforcement clauses under §§ 3 and 4—which authorize a court to stay a proceeding and compel arbitration—the Supreme Court reasoned that §§ 3 and 4 cannot apply to an arbitration agreement that is excluded from the FAA's coverage by the terms of §§ 1 and 2. *Id.* at 537–38. Pursuant to the rationale offered by *Rent-A-Center*, the Court viewed a delegation clause as "merely a specialized type of arbitration agreement," and, as a result, held that the same reasoning applied. *Id.* at 538.

This background sets the stage for our case: the contract between the parties contains an arbitration provision and a delegation clause. If the contract is covered by the FAA, these provisions might combine to require the parties to have much of their dispute resolved by an arbitrator. However, the parties disagree over whether their contract is excluded from the FAA under the residual clause of § 1.

## B. Procedural

### 1. Proceedings in the District Court

Singh brought this putative class action in the Superior Court of New Jersey, Monmouth County, on behalf of himself and other similarly situated New Jersey Uber drivers. He alleged that Uber misclassified them as independent contractors as opposed to employees, and that, as a result, Uber deprived them of overtime compensation, and required them to incur business expenses for the benefit of Uber. Uber removed

6

the action to federal court in the District of New Jersey. It then moved to dismiss the action and compel arbitration pursuant to the arbitration provision of an agreement between the parties called the Rasier Software Sublicense Agreement ("Rasier Agreement").

In response to the motion, Singh argued that there was no valid agreement between Uber and him, and, even if there was, he was not bound by its arbitration provision for four reasons: (1) Uber failed to meet its burden to show that the provision was a constitutional waiver of the Seventh Amendment right to a jury trial; (2) the provision is excluded under the residual clause of § 1 of the FAA; (3) the provision violated the National Labor Relations Act ("NLRA"), the Norris-LaGuardia Act, and the New Jersey Wage and Hour Law ("NJWHL"); and (4) the provision was unconscionable.

As to the residual clause of § 1 of the FAA specifically, Singh argued that he had at least put forth enough to warrant discovery on the question. He relied on our decision in *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764 (3d Cir. 2013), to support this argument. There, we recognized that our precedents suggested two possible standards under which a motion to compel arbitration could be decided—the motion to dismiss standard or the summary judgment standard. *Id.* at 771–72. The two differ significantly, as we accept as true the facts established by the pleadings—the complaint and incorporated documents—when deciding the former, but, for the latter, we require the party opposing the motion to submit evidence, which is typically obtained through discovery. *See id.* at 772 (citing Fed. R. Civ. P. 56(c)(1)(A)).

We held that the motion to dismiss standard applies to a motion to compel arbitration where a party's claims are

7

"subject to an enforceable arbitration clause"—that is, where the *existence* of a valid agreement to arbitrate between the parties is apparent from the face of the complaint or incorporated documents. *Id.* at 774, 776. "But if the complaint and its supporting documents are unclear" as to whether the parties agreed to arbitrate, "*or* if the plaintiff has responded to a motion to compel arbitration with *additional facts* sufficient to place the agreement" in dispute, a "restricted inquiry into factual issues [is] necessary . . . ." *Id.* at 774–75 (emphases added) (internal quotation marks and citations omitted). The motion to compel arbitration is judged under a summary judgment standard if it is renewed after this inquiry. *Id.* at 775.

Uber asked the Court to reject this request for discovery on the grounds that the residual clause of § 1 of the FAA only applies to transportation workers that transport goods, the parties' agreement states that the FAA would govern, and that, even if the FAA did not govern, the result would be the same under the New Jersey Arbitration Act ("NJAA"), N.J. Stat. Ann. §§ 2A:23B-1 to -32. In addition, Uber put forth that the parties' agreement contained a valid delegation clause, which, unless successfully challenged, required that all the issues Singh raised regarding the validity of their arbitration agreement—including the § 1 residual clause issue—be decided by an arbitrator.

The District Court ruled in Uber's favor, without addressing the discovery or delegation clause arguments.

It recognized that the parties had "agree[d] to have [threshold issues] decided by an arbitrator through the inclusion of a delegation clause within the arbitration agreement," App. 7, but nonetheless proceeded to address four of the five issues presented by Singh. It determined that the

8

delegation clause was valid, that the parties had in fact entered into a valid and enforceable arbitration agreement, and that the residual clause of § 1 of the FAA does not extend to transportation workers who transport passengers. It also found that the arbitration provision did not violate the NLRA or the other labor-related statutes, and was not unconscionable. It did not decide whether the parties' dispute fell within the scope of the arbitration provision, on the basis that the delegation clause required that this determination be "reserved for the arbitrator." App. 28.

## 2. Proceedings on Appeal

Singh appealed the District Court's § 1 determination, its determination that the arbitration provision did not violate the NJWHL, its failure to address his Seventh Amendment argument, and its rulings on unconscionability.[1] In its response brief on appeal, Uber primarily argued that Singh had waived any issue as to the enforceability of the delegation clause, and, as such, all of the issues Singh raises on appeal must be decided by an arbitrator. Given *New Prime*, Uber now concedes that a court has to resolve Singh's § 1 argument as an antecedent matter.

---

[1] After the District Court's decision, the Supreme Court issued a ruling that foreclosed Singh's NLRA and Norris-LaGuardia Act arguments. In particular, the Supreme Court held that the NLRA fell short of reflecting a clear and manifest intent by Congress to displace the FAA, and that, "just as under the NLRA, the [Norris-LaGuardia Act] does not conflict with Congress's directions favoring arbitration." *See Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624–30 (2018).

Section 1 of the FAA requires that we determine whether the agreement between Singh and Uber qualifies as a "contract[] of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Of course, there is no dispute as to whether Uber drivers like Singh are seamen or railroad employees. Rather, the dispute centers on § 1's residual clause—the "any other class of workers" portion—with Uber arguing that the agreement between it and Singh does not qualify as a "contract of employment," Appellee Resp. Br. 19–20, and, even if it did, Singh does not belong to a class of workers engaged in interstate commerce because such drivers transport passengers, and not goods, and they do so "only locally," Appellee Resp. Br. 20–26. *New Prime* eliminated Uber's "contract of employment" argument, *see New Prime*, 139 S.Ct at 541 ("Congress used the term 'contracts of employment' in a broad sense to capture any contract for the performance of *work* by *workers*." (emphasis in original)), so we are left with its transportation-of-goods and "engaged in interstate commerce" arguments.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1332(d) and 1453, and we have jurisdiction under 28 U.S.C. § 1291. We review the District Court's order compelling arbitration *de novo*, since it presents a question of law. *Reading Health Sys. v. Bear Stearns & Co.*, 900 F.3d 87, 100 n. 61 (3d Cir. 2018). We apply the same standard as the District Court, so "we are first obliged to determine which standard should have been applied." *Guidotti*, 716 F.3d at 772.

10

## A. The Framework for Deciding Which Standard

Recall that the two options are the motion to dismiss standard under Rule 12(b)(6) and the summary judgment standard under Rule 56, and that we set forth a framework for determining which should apply to a motion to compel arbitration in *Guidotti*. The centerpiece of that framework is whether the existence of a valid agreement to arbitrate is apparent from the face of the complaint or incorporated documents. *Id.* at 774–76.

This is so because it represents a balancing of the competing purposes of the FAA by fostering "efficient and speedy dispute resolution" tempered by the "important aim" of "enforc[ing] . . . private agreements" and the "significant role courts play in interpreting the validity and scope of contract provisions . . . ." *Id.* at 773 (internal quotation marks and citations omitted). Notably, juxtaposed with Congress's "declaration of a liberal federal policy favoring arbitration agreements," *id.* (internal quotation marks and citation omitted), § 4 of the FAA establishes that a court must be "satisfied that the making of the agreement for arbitration or failure to comply therewith is not in issue" before "mak[ing] an order directing the parties to proceed to arbitration . . . ." 9 U.S.C. § 4. Thus, we determined that the interest in speedy resolution needs no tempering where "the affirmative defense of arbitrability of claims is apparent on the face of a complaint" (or incorporated documents). *Id.* at 773–74 (internal quotation marks and citation omitted). However, we recognized that "a more deliberate pace is required" where the motion "does not have as its predicate a complaint with the requisite clarity" as to whether "the parties agreed to arbitrate." *Id.* at 774 (internal quotation marks and citation omitted).

11

A similar balancing is required with respect to the issue presented here. Indeed, like the agreement-to-arbitrate issue posed in § 4 of the FAA, the applicability of the residual clause of § 1 is not merely "presumed to be [a] question[] for judicial determination." *See id.* at 773 (citation omitted). Rather, *New Prime* establishes that a court must be satisfied that this clause does not apply before making an order that the parties proceed to arbitration pursuant to §§ 3 and 4 of the FAA. We therefore determine that a "restricted inquiry" may be necessary to resolve a motion to compel arbitration that presents an issue regarding the applicability of the residual clause of § 1.

Specifically, where the issue of whether the residual clause of § 1 of the FAA applies arises in a motion to compel arbitration, the motion to dismiss standard applies if the complaint and incorporated documents provide a sufficient factual basis for deciding the issue. But where those documents do not, or the plaintiff responds to the motion with additional facts that place the issue in dispute, "the parties should be entitled to discovery on the question of arbitrability before a court entertains further briefing . . . ," with an application of the summary judgment standard to follow. *Id.* at 776 (alteration in original) (internal quotation marks and citation omitted).

## B. Standard Applied by the District Court

Here, the District Court's view was that the residual clause of § 1 of the FAA does not extend to transportation workers who transport passengers. So, to decide the § 1 residual clause inquiry, the fact that Uber drivers transport passengers need only have been apparent from the face of the Amended Complaint, from an exhibit attached to the Amended Complaint, as a matter of public record, or from documents

12

incorporated or explicitly relied upon in the Amended Complaint. *See Guidotti*, 716 F.3d at 772. Setting aside the affidavit submitted by Uber as not qualifying as any of these, the Amended Complaint and the Rasier Agreement each independently establish that Uber drivers transport passengers. *See, e.g.*, Amended Compl. ¶ 18, ECF No. 7 ("Defendant offers customers the ability to *hail a car service driver* via a mobile application." (emphasis added)); Rasier Agreement, App. 42 (characterizing Uber drivers as "providers of . . . peer-to-peer . . . *passenger transportation* services . . .") (emphasis added)). Along those lines, the affidavit submitted by Singh in his response to Uber's motion does not place this issue in dispute, but further establishes that Uber drivers transport passengers. *See, e.g.*, Singh Decl. ¶ 28 ("I regularly picked up customers . . .").

We therefore view the District Court's decision as applying a motion to dismiss standard on the issue of whether the residual clause of § 1 of the FAA applies to transportation workers that transport passengers.

## III.    DISCUSSION

For our part, as we alluded to, whether the residual clause of § 1 applies in this case and operates to exclude the Rasier Agreement (including the arbitration provision and delegation clause) from FAA coverage is really a two-part inquiry asking (1) if § 1 only applies to transportation workers who transport goods, or also those who transport passengers, and (2) whether Singh belongs to a class of workers that are engaged in interstate commerce. The latter question is reached only if the former is answered in the affirmative.

13

(A) We part company with the District Court and so answer: the residual clause of § 1 is not limited to transportation workers who transport goods, but may also apply to those who transport passengers, so long as they are engaged in interstate commerce or in work so closely related thereto as to be in practical effect part of it.

(B) We then return to the *Guidotti* framework to determine whether the engaged-in-interstate-commerce inquiry can be resolved from the pleadings, and if so, whether Singh's submissions in response to the motion to compel arbitration operate to place the issue in dispute. Since neither the Amended Complaint nor incorporated documents suffice for determining whether Singh belongs to a class of workers that are engaged in interstate commerce or sufficiently related work, we will ultimately remand for the District Court to examine the issue, with instruction to permit limited discovery before entertaining further briefing. If Uber chooses to reassert its motion after this discovery is completed, the District Court shall apply the summary judgment standard under Federal Rule of Civil Procedure 56 and decide only this aspect of the § 1 residual clause inquiry, which will be dispositive as to whether the FAA applies.[2]

---

[2] Because the motion to dismiss the case and compel arbitration was filed before discovery, and this case involves consideration of a threshold issue concerning whether the FAA even applies, Judge Shwartz does not agree that the framework set forth in *Guidotti* is applicable but agrees that the case should be remanded to allow the parties to conduct discovery on whether Singh belongs to a "class of workers engaged in

14

And (C) we ultimately do not reach the remaining issues raised by the parties because they are contingent on the FAA's applicability.

### A. Transportation Workers who Transport Passengers May be § 1 Exempt

#### 1. Workers who Transport Passengers May be § 1 Exempt

Section 1 of the FAA provides that "nothing" in the FAA "shall apply" to "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. In our en banc decision in *Tenney Engineering, Inc. v. United Electrical Radio & Machine Workers of America, (U.E.) Local 437*, 207 F.2d 450, 452 (3d Cir. 1953), we held that, under the rule of *ejusdem generis*,[3] the residual clause of this provision only includes those other classes of workers "who are actually engaged in the movement of interstate or foreign commerce or in work so closely related thereto as to be in practical effect part of it." In so holding, we reaffirmed our previous decisions in *Amalgamated Association Street Electric Railway & Motor Coach Employees of America, Local Div. 1210 v. Pennsylvania*

foreign or interstate commerce" for purposes of determining whether the FAA exemption applies.

[3] This is a statutory canon through which, "when a statute sets out a series of specific items ending with a general term, [the] general term is confined to covering subjects comparable to the specifics it follows." *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 586 (2008).

*Greyhound Lines*, 192 F.2d 310 (3d Cir. 1951) ("*Greyhound I*") and *Pennsylvania Greyhound Lines v. Amalgamated Association of Street, Electric Railway & Motor Coach Employees of America, Division 1063*, 193 F.2d 327 (3d Cir. 1952) (per curiam) ("*Greyhound II*"). Those cases held that the collective bargaining agreement between a union and bus line employees qualified as a contract of employment of a class of workers engaged in interstate commerce. *See Greyhound I*, 192 F.2d at 313; *Greyhound II*, 193 F.2d at 328.

In *Tenney*, we had occasion to reconsider our holdings in *Greyhound I* and *Greyhound II*. Then-Chief Judge Biggs concurred in the judgment, but proposed that we should overturn those decisions on two fronts: first, he argued that a collective bargaining agreement should not be considered a contract of employment, and second, that the residual clause of § 1 should encompass both those engaged in transporting goods in foreign or interstate commerce and those, such as manufacturing workers, that are engaged in the production of goods for interstate commerce. *Tenney*, F.2d 454–55 (Biggs, C.J., concurring). We did not adopt either view, but instead affirmed *Greyhound I* and *Greyhound II*, characterizing the bus line employees as "being directly engaged in the channels of interstate transportation *just as are railroad workers*." *Id.* at 453 (emphasis added).

Nearly fifty years later, the Supreme Court reached the same conclusion, and held that the residual clause of § 1 only operates to exclude from FAA coverage "contracts of employment of transportation workers" who are engaged in interstate commerce. *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 118–19 (2001); *see also Palcko v. Airborne Express, Inc.*, 372 F.3d 588, 593 (3d Cir. 2004) ("[T]he Supreme Court's later decision in *Circuit City* essentially affirmed [our]

16

analysis [in *Tenney*].").  The *Circuit City* Court was presented with the question of whether the residual clause of § 1 applies to all contracts of employment, or simply those of transportation workers.  To resolve it, it took the textualist approach we applied in *Tenney*, reasoning that, because the phrase "any other class of workers engaged in . . . interstate commerce" constitutes a residual clause following explicit references to "seamen" and "railroad employees," the maxim of *ejusdem generis* requires that it be construed to only embrace "objects similar in nature to those objects enumerated by the preceding specific words."  *Circuit City*, 532 U.S. at 114–15.  As such, the Court held that the residual clause of § 1 only exempts the contracts of employment of transportation workers.  *Id.* at 119; *see also New Prime*, 139 S. Ct at 538 ("In *Circuit City,* we acknowledged that 'Section 1 exempts from the [Act] . . . contracts of employment of transportation workers.'" (citation omitted)).

## 2. Uber Does Not Convince Us Otherwise

With the foregoing in tow, Uber endeavors to convince us that the residual clause of § 1 should not apply to transportation workers sufficiently engaged in interstate commerce, but rather only those who transport goods in interstate commerce.

### a.

#### i.

Uber's preferred course is not the text.  On its face, nothing in the residual clause of § 1 suggests that it is limited to those who transport goods, to the exclusion of those who

17

transport passengers.  In fact, the text indicates the opposite.[4]
Recall that the provision excludes "contracts of employment of
. . . *any* other class of workers *engaged in foreign or interstate
commerce*," 9 U.S.C. § 1 (emphasis added), and that the
decision to narrow this clause to only transportation workers is
premised on the textual canon of interpretation, *ejusdem
generis*.  In this context, this means that the residual clause of
§ 1 only includes those workers that are engaged in foreign or
interstate commerce in a manner similar to seamen and railroad
employees.

　　With that in mind, Uber cannot direct us to any
contemporary statutes or sources that define the terms
"seamen" and "railroad employees" to only include those who
transport goods.  To the contrary, in its efforts to offer a
rationale for why Congress might have created a carve-out for

---

[4] In this regard, we share our concurring colleague's
inclination that, standing alone, the term "commerce" does not
inhere a goods-versus-passengers distinction.  But ending the
analysis there would be inconsistent with our decision in
*Tenney* as well as the Supreme Court's in *Circuit City*.  Neither
turned on the meaning of the term "commerce" in a vacuum.
Indeed, had either done so, the residual clause of § 1 would
likely not have been limited to the employment contracts of
transportation workers.  This is obviously not the case, and
*ejusdem generis*'s invocation is the culprit.  *See Circuit City*,
532 U.S. at 114–16 (rejecting the notion that §§ 1 and 2 are
"coterminous" because "[c]onstruing the residual phrase to
exclude all employment contracts fails to give *independent*
effect to the statute's enumeration of the specific categories of
workers which precedes it" (emphasis added)).

seamen and railroad employees, the *Circuit City* Court referenced two contemporary statutes: the Transportation Act of 1920 and the Railway Labor Act of 1926. *Circuit City*, 532 U.S. at 121. Each purported to resolve disputes between carriers and their employees and, in so purporting, defined "carrier" to include "sleeping car compan[ies]," which are railway passenger cars.[5] Transportation Act of 1920, Pub. L. No. 66-152, § 300(1), 41 Stat. 456, 469; Railway Labor Act of 1926, Pub. L. No. 69-257, § 1, 44 Stat. 577, 577 (codified and later repealed at 45 U.S.C. § 651).

In addition, the Supreme Court acknowledged the broad sweep of these terms in *New Prime*. There, New Prime had argued that the term "contracts of employment" does not extend to independent contractor agreements. *New Prime*, 139 S.Ct at 538–39. However, the residual clause of § 1 purports to apply to the contracts of employment of "any other class of *workers*," which is indisputably broader than those of employees and suggests that independent-contractor agreements were to be encompassed. *Id.* at 542. To overcome

---

[5] The Transportation Act of 1920 and the Railway Labor Act of 1926 also each defined "carrier" to include "any carrier by railroad, subject to the Interstate Commerce Act" ("ICA") excluding local electrical rails. 41 Stat. 456, § 300(1); 44 Stat. 577, § 1, 46 U.S.C.§ 651 (repealed). The provision of the ICA in turn applied "to any common carrier or carriers engaged in the transportation of passengers or property wholly by railroad, or partly by railroad and partly by water . . ." between states. ICA, Pub. L. No. 49-104, § 1, 24 Stat. 379, 379 (1887).

that, New Prime pointed out that § 1 enumerates the contracts of employment of "seamen" and "railroad employees," which it argued included "*only* employees in 1925." *Id*. (emphasis in original). The Court rejected this argument, characterizing it as "rest[ing] on a precarious premise," because, "[a]t the time of the [FAA]'s passage," even "shipboard surgeons who tended to injured sailors were considered 'seamen' . . . ." *Id.* at 542–43.[6] The Court also referenced the Transportation Act of 1920's definition of "railroad employees" and the 1898 Erdman Act's "equally broad understanding" of the term, the latter of which encompassed "all persons actually engaged in any capacity in train operation or *train service of any description*." *Id.* at 543 n.12 (emphasis added).[7]

---

[6] The cases that the Court cited in support of this proposition also clearly contemplated the presence of seamen on passenger ships. *See The Sea Lark*, 14 F.2d 201, 201–02 (W.D.Wash.1926) (describing cooks, surgeons, and bartenders as seamen, and holding that musicians on a boat used for excursions were seamen); *The Buena Ventura*, 243 F. 797, 799 (S.D.N.Y. 1916) (discussing a case that "held that a warranty to carry '30 seamen besides passengers' meant that the 30 seamen included a cook, a surgeon, and other employe[e]s" (citation omitted)); *Allan v. State S.S. Co.*, 30 N.E. 482, 483–84 (1892) (discussing the duty arising from Great Britain's Passenger Act of 1855 of "defendant[,] a common carrier of passengers," to employ a shipboard surgeon with an appropriate supply of medicines).

[7] As the Court explained, the Erdman Act was "enacted to address disruptive railroad strikes at the end of the 19th century." *New Prime*, 139 S. Ct. at 543.

Thus, if anything, a textual approach to the residual clause of § 1 suggests that it extends to both transportation workers who transport goods as well as those who transport passengers.

ii.

Precedent also fails to give Uber succor on this point. All sides agree that, as it stands, our decisions in *Tenney*, *Greyhound I*, and *Greyhound II* are unequivocal that the residual clause of § 1 excludes the contracts of employment of transportation workers who transport passengers from the FAA. Equally, *Circuit City* essentially affirmed our ruling in *Tenney* that the residual clause of § 1 of the FAA operates to exclude the contracts of employment of transportation workers. And, to some extent, *New Prime* affirmed our *Greyhound* rulings that the term "contract of employment" includes more than employment contracts in the modern, strict sense. *New Prime Inc.*, 139 S. Ct. at 539 (explaining that, at the time of the FAA's enactment, "dictionaries tended to treat 'employment' more or less as a synonym for 'work[,' and] . . . did [not] distinguish between different kinds of work or workers.").

b.

So Uber clings to inapposite dicta and legislative history, to no avail.

i.

It first ventures into Supreme Court dicta from *Circuit City*. Specifically, in setting forth the issue presented on appeal, the Supreme Court briefly reiterated the circuit split

21

between the Ninth Circuit and most other circuits, including ours. It described most circuits as having concluded that the residual clause of § 1 only excludes "transportation workers, defined, for instance, as those workers 'actually engaged in the movement of goods in interstate commerce.'" *Circuit City*, 532 U.S. at 112 (citations omitted). The District Court doubled down on this characterization, and further asserted that "[t]o date, virtually every circuit having considered the issue has found that [the residual clause of § 1] only applies to those employees who are actually engaged in the movement of goods as opposed to the transportation of people, in interstate commerce." App. 17. On this basis, the District Court sided with Uber and disregarded our precedent as outdated and unintentional. *See* App. 18 n.8 (setting aside *Greyhound I* and *Greyhound II* as "primarily deal[ing] with the issue of whether a collective bargaining agreement constitutes a contract of employment—not whether employees who transport people, as opposed to goods, fall within the scope of [§ 1].").

We disagree.

As an initial matter, although "we pay due homage to the Supreme Court's *well-considered* dicta as pharoi that guide our rulings," our Court is bound by the holdings of Supreme Court cases, not dicta. *IFC Interconsult, AG v. Safeguard Int'l Partners, LLC.*, 438 F.3d 298, 311 (3d Cir. 2006) ("*IFC*") (emphasis added). In *IFC*, we rejected a party's argument that the Supreme Court implicitly overturned our prior precedent because it referred to that decision as being on the wrong side of a circuit split. *Id.* at 310–11. Expelled in a footnote, we held that this was "hardly a well-considered dictum[, as it] merely illustrat[ed] a circuit split . . . ." *Id.* at 311.

The *Circuit City* dicta Uber relies on is of the same token, for it also merely illustrates a circuit split. The language appears in the section of the Court's decision in which it clarifies the issue before it as being whether the residual clause of § 1 encompasses all contracts of employment, or only those of transportation workers. *Circuit City*, 532 U.S. at 112–13. The Court set out the division among the circuits by explaining that, "[m]ost Courts of Appeals" had "conclude[d that] the exclusion provision is limited to transportation workers, defined, *for instance*, as those workers 'actually engaged in the movement of goods in interstate commerce.'" *Circuit City*, 532 U.S. at 112 (emphasis added) (internal quotation marks and citations citation omitted). But the Ninth Circuit interpreted the provision "to exclude all contracts of employment from the reach of the FAA." *Id.* The Supreme Court's only mention of these Courts of Appeals decisions in the actual analysis is where the Court explains that its decision that the residual clause of § 1 only extends to transportation workers was in line with the majority view. *See id.*

Further, unlike *IFC*, the Court ultimately determined that our precedent was on the right side of the split. It cited the D.C. Circuit's decision in *Cole v. Burns International Security Services*, 105 F.3d 1465, 1471 (D.C. Cir. 1997), as indicating the position of most Courts of Appeals. *See Circuit City*, 532 U.S. at 119. Notably, the portion of *Cole* that the Court references string cites the prior Courts of Appeals decisions that held the majority view, including our en banc decision in *Tenney*. *See Cole*, 105 F.3d at 1471. The Supreme Court dicta relied on by Uber is thus too far removed from what we would characterize as well-considered. *Circuit City* did not overrule our prior decisions.

23

We are also not persuaded that any decisions by our sister circuits contradict ours in *Tenney*, *Greyhound I*, and *Greyhound II*. Although *Cole* determined that the residual clause of § 1 did not extend to a security guard at a train station because he was not "engaged in the transportation of goods in interstate commerce," none of the Court of Appeals decisions it cited held that the residual clause of § 1 only extended to those who transported goods, and, as we set out earlier, *Tenney* stood for the exact opposite proposition. Rather, like *Cole*, our sister courts have only gone as far as to draw the line where *Circuit City* did, despite passing references to goods.

Indeed, in one form or another, all were confronted with the same question: whether the residual clause of § 1 covered the contracts of employment of those who were not in the transportation industry at all. *See, e.g.*, *Paladino v. Avnet Comput. Techs.*, 134 F.3d 1054, 1061 (11th Cir. 1998) (involving someone who provided technical support to computer system salespeople) (Cox, J., concurring); *Rojas v. TK Communs.*, 87 F.3d 745, 747 (5th Cir. 1996) (involving a disc jockey at a radio station); *Asplundh Tree Expert Co. v. Bates*, 71 F.3d 592, 593–94, 596 (6th Cir. 1995) (involving the controlling shareholder and chairman of a utility company); *O'Neil v. Hilton Head Hosp.*, 115 F.3d 272, 273–74 (4th Cir. 1997) (involving a respiratory therapist at a hospital); *Matthews v. Rollins Hudig Hall Co.*, 72 F.3d 50, 52, 53 n.3 (7th Cir. 1995) (involving a consultant hired by a brokerage firm); *Miller Brewing Co. v. Brewery Workers Local Union No. 9, AFL-CIO*, 739 F.2d 1159, 1162 (7th Cir. 1984) (involving a union representing the brewers in Milwaukee); *Erving v. Virginia Squires Basketball Club*, 468 F.2d 1064, 1066 (2d Cir. 1972) (involving Julius Erving, the professional basketball player famously known as "Dr. J."). *See also Lenz v. Yellow*

24

*Transp., Inc.*, 431 F.3d 348, 351 (8th Cir. 2005) (involving a customer service representative for a transportation company)[8]; *Hill v. Rent-A-Center., Inc.*, 398 F.3d 1286, 1288 (11th Cir. 2005) (involving an account manager for a furniture and appliance rental business).

ii.

As for legislative history, Uber returns us to *Circuit City*, where the Supreme Court suggested that Congress might have limited § 1 to seamen and railroad employees because there were statutory dispute resolution schemes already in place for such workers. *Circuit City*, 532 U.S. at 120–21. Based on this suggestion, Uber argues that the absence of an alternate dispute resolution scheme for Uber drivers means that

---

[8] Uber relies heavily on *Lenz*, pointing out its various references to "goods" in its analysis of whether a customer service representative for a transportation company was a transportation worker for purposes of FAA exemption. 431 F.3d at 352–53. Within the same analysis, the *Lenz* court quoted another circuit court's statement that "[n]umerous courts" have defined "transportation workers" to include "bus drivers and truck drivers." *Id.* at 351 (quoting *Am. Postal Workers Union v. United States Postal Serv.*, 823 F.2d 466, 473 (11th Cir. 1987)). This seeming contradiction simply demonstrates that the *Lenz* court, like all of the courts to paraphrase *Circuit City's* "goods" language in similar circumstances, did not have the question of passengers versus cargo before it, and simply used "goods" as a convenient shorthand to discuss interstate commerce.

Congress did not intend § 1 to extend to such workers. The problems are legion.

For one, prior to venturing into legislative history, *Circuit City* makes clear that its decision did not at all rely on this history, and cautioned against doing so where, as here, a textual analysis is determinative. *Id.* at 119 ("As the conclusion we reach today is directed by the text of § 1, we need not assess the legislative history of the exclusion provision."). It then expressly noted that "the legislative record on the § 1 exemption is quite sparse," and comprises of testimony before a Senate subcommittee, as opposed to appearing in the official Senate and House Reports or arising in a debate on the floor of either chamber. *Id.* at 120 (warning that legislative history is "far more [problematic] when we consult sources still more steps removed from the full Congress and speculate upon the significance of the fact that a certain interest group sponsored or opposed particular legislation").

So, pressed by the respondent who argued that the Court's holding "attribute[d] an irrational intent to Congress," the Court merely speculated that *one* plausible explanation for what otherwise seems like an out-of-place limitation is that, as to these workers, Congress was certain that its commerce power would extend, since it had previously regulated them. *Id.* at 120–121. Notably, "[b]y the time the FAA was passed, Congress had already enacted federal legislation providing for the arbitration of disputes between seamen and their employers." *Id.* at 121 (citations omitted); *see also New Prime*, 139 S. Ct at 537 (characterizing this portion of § 1 as a "very particular qualification" that may be explained by the "prescribed alternative employment dispute resolution regimes for many transportation workers," which Congress may not have wished to "unsettle" (internal quotation marks omitted)

26

(quoting *Circuit City*, 532 U.S. at 121)). If attempting to infer Congress' intent from testimony before a subcommittee of one chamber is "particularly problematic," *Circuit City*, 532 U.S. at 119, doing so from mere judicial speculation is at least equally imprudent. We refuse to go down that road. Instead, we read the passage cited by Uber as merely combatting the argument that there is no plausible explanation for the residual clause of § 1 to be limited to transportation workers.

Another roadblock for Uber's view is that Uber has never framed the issue as whether § 1 extends to Uber drivers specifically, but rather as whether it extends to transportation workers who transport passengers. This is what the District Court focused on. However, *Circuit City*'s reference to the dispute resolution schemes in place for "seamen" and "railroad employees" squarely cuts against the notion that the residual clause of § 1 only extends to those who transport goods. As the Court acknowledged in *New Prime*, the statutes setting forth some of these schemes covered employees in the broadest sense, with no distinction between those engaged in transporting goods versus passengers. *See New Prime*, 139 S.Ct. at 539–40.

Worse yet, the rationale *Circuit City* offers as explaining why the residual clause of § 1 would be tethered to the enumerated clauses listing "seamen" and "railroad workers" suggests that the residual clause is not limited to only those workers for whom a dispute resolution scheme exists. On this point, *Circuit City* explains that, "[i]t would be rational for Congress to ensure that workers in general would be covered by the provisions of the FAA, while reserving for itself more specific legislation for those engaged in transportation." 532 U.S. at 121 (citation omitted). It then proceeds to describe the 1936 amendment to the Railway Labor Act as such

27

legislation, recognizing that the amendment was to include "air carriers and their employees." *Id.* (citation omitted). Setting aside that air carriers and their employees are invariably engaged in the transportation of passengers, this explanation suggests that air carriers and their employees were covered by § 1 even before the Railway Labor Act was amended—that is, before a dispute resolution scheme existed for them.[9]

---

[9] Uber attributed a contrary reading to an unreported Northern District of California decision, *Veliz v. Cintas Corporation*, 2004 WL 2452851 (N.D. Cal. 2004). But *Veliz* did not suggest that the existence of special arbitration legislation should be dispositive. Rather, as we conclude, this decision recognized that the terms "seamen" and "railroad employees" are broad. *See id.* at *4 (relying on the Jones Act and Shipping Commissioners Act of 1872 definition of "seamen" to conclude that "seamen, whether they are in the business of goods or not, have been found to be exempted from arbitration under the FAA § 1"); *id.* (concluding that the definition of railroad employees "appears to be broad[,] . . . because of subsequent judicial interpretation of the term . . . in other federal statutes, such as the Transportation Act of 1920 and Railway Labor Act of 1926").

As a result, *Veliz* merely suggests that the existence of special arbitration legislation be one of the factors in determining whether the residual clause of § 1 applies, in conjunction with a non-exhaustive list of other characteristics thought to be possessed by seamen and/or railroad employees. *See id.* at *7. Some of these characteristics speak to a factual universe that is beyond our own. *See id.* (suggesting that courts also consider whether a strike by the employee would interrupt

28

In the end, we remain unswayed by Uber's attempt to drive us towards its imagined sunset. Consistent with our decisions in *Tenney*, *Greyhound I*, and *Greyhound II*, we hold that the residual clause of § 1 of the FAA may operate to exclude from FAA coverage the contracts of employment of all classes of transportation workers, so long as they are engaged in interstate commerce, or in work so closely related thereto as to be in practical effect part of it.

## B. The District Court Will Decide in the First Instance Whether the Class of Workers to Which Singh Belongs are Engaged in Interstate Commerce

### 1. Discovery is Warranted

Our analysis stops here. The District Court did not determine whether Singh's class of transportation workers is engaged in interstate commerce or sufficiently related work,

---

interstate commerce). Interestingly, however, three of the five *Veliz* factors that we can determine on the record before us cut in favor of concluding that the residual clause of § 1 may extend to drivers like Singh. *See id.* (consisting of whether "the vehicle itself is essential to the commercial enterprise of the defendant-employer," "[t]he nexus between the employee's job and the vehicle," "[w]hether the employee is employed in the transportation industry," "[w]hether the employee is directly responsible for the transporting of goods in interstate commerce," and "[w]hether . . . special arbitration legislation already existed at the time the FAA was enacted" (internal quotation marks omitted)).

nor could it. At this stage, a court may only make that determination if the complaint and incorporated documents suffice. If not, or if so and Singh's opposition to the motion to compel arbitration places the issue in dispute, discovery must be allowed before entertaining further briefing on the question.

The latter course is warranted here. Unlike the issue of whether Uber drivers transport goods, the pleadings say little about whether the class of transportation workers to which Singh belongs are engaged in interstate commerce or sufficiently related work. The Amended Complaint is devoid of any facts pertaining to the issue. In addition, Singh's submissions in opposition to the motion further place the issue in dispute—in his affidavit, he avers that he frequently transported passengers on the highway across state lines, between New York and New Jersey. Singh Decl. ¶ 28, 29, App. 34.[10]

---

[10] Uber sought to counter this averment by representing to the Court that "the undisputed evidence demonstrates Uber operates on a localized, city-by-city basis." Appellee Suppl. Br. 3–4 (citing App. 36). However, Uber's only support for this averment is the affidavit it submitted, which merely states that "[t]he Uber App is available to riders and transportation providers in over 150 cities across the country," Colman Decl. ¶ 5, App. 36, and is beyond the scope of what a court may consider at this stage.

30

2.  We Reject the Parties' Efforts to Restrict the Engaged-In-Interstate Commerce Inquiry to Their Contract or General Knowledge about the Nature of the Work

At argument, each party suggested that there was ample basis to find in their respective favors.  Singh suggested that we look to what the contract of employment between the parties contemplates as determinative on the engage-in-interstate-commerce inquiry.  He then argued that the Rasier Agreement implicitly, but fairly, contemplated a relationship with drivers across all fifty states, and that encompassed interstate travel.  Uber, on the other hand, suggested that we look to whether the character of the work performed by the workers was inherently local (presumably from our general knowledge about these drivers), and argued that this is the case with drivers like Singh, even if they cross state lines from time to time.

We cannot endorse either view.  Although § 1 excludes the "contracts of employment" of certain workers, nothing suggests that those contracts ought to be dispositive as to what constitutes those workers.  The Supreme Court's efforts in *New Prime* and *Circuit City* to determine what constituted seamen and railroad employees are instructive on this point.  In both instances, the Court did not resort to the employment contract, but rather contemporary dictionaries and statutes that purported to define these workers.  We recognize that the inquiry regarding § 1's residual clause asks a court to look to classes of workers rather than particular workers and is thus materially different than the Supreme Court's efforts to define seamen and railroad employees.  But this difference does not relegate a court to private contracts as its only source.  Nor

31

must its analysis hinge on any one particular factor, such as the local nature of the work.[11]

The inquiry remains whether Singh belongs to a class of transportation workers engaged in interstate commerce or in work so closely related thereto as to be in practical effect part of it. This inquiry can be informed by various factors. The District Court may thus be equipped with a wide variety of sources, including, but not limited to and in no particular order, the contents of the parties' agreement(s), information regarding the industry in which the class of workers is engaged, information regarding the work performed by those workers,

---

[11] Uber referenced the Eleventh Circuit's decision in *Hill v. Rent-A-Center, Inc.* as supporting its suggestion, and to argue that a ruling in Singh's favor would trigger a circuit split. However, the Eleventh Circuit was express that the residual clause of § 1 did not apply in *Hill* because the employee at issue—an account manager at Rent-A-Center—"[was] not a transportation industry worker." 398 F.3d at 1288. This was premised on the fact that the account manager's transportation activities were incidental. *Id.* at 1289–90. The opposite is true here—if anything is clear, it is that Uber drivers' transportation activities are more than incidental. It is the extent to which their activities constitute engagement in interstate commerce that is the question. On this question then, the notion of incidental interstate travel does us no good. This is because, even if we definitively drew the line at incidental interstate travel (rather than viewing that as one, or even a primary factor), the Amended Complaint and Rasier Agreement do not provide us with the requisite facts to determine if incidental travel is in fact what the class of transportation workers at issue engage in.

and various texts—*i.e.*, other laws, dictionaries, and documents—that discuss the parties and the work.

We will therefore proceed with remanding this issue to the District Court, along with instruction that it permit discovery on the question before entertaining further briefing.

## C.  Remaining Issues

In one way or another, Singh's arguments that the arbitration agreement is unenforceable because of the Seventh Amendment, the NJWHL, and New Jersey law on unconscionability turn on the FAA's applicability.  We therefore decline the parties' invitation for us to opine on these issues and leave it to the District Court to address any remaining arguments it deems appropriate, once it determines whether the FAA applies.

In that vein, we note that the District Court previously found the delegation clause to be enforceable, and it recognized that the clause reserved questions of arbitrability for an arbitrator to decide.  *See* App. 28.  But the Court's opinion suggests that the only question it viewed as one of arbitrability was "whether the parties' disputes [fell] within the scope of" their agreement to arbitrate.  *Id.*  Uber's opening brief properly takes issue with this narrow reading of the Rasier Agreement's delegation clause.  *See* Rasier Agreement § 15.3(i), App. 56–57 (delegating "disputes arising out of or relating to interpretation or application of [the] Arbitration Provision, including enforceability, revocability, or validity").  We instruct the District Court that, where the FAA is held to apply, all other questions must be reserved for an arbitrator unless it is determined that the question cannot be (as in the

case of the § 1 exemption/exclusion issue) or is not subject to an enforceable delegation clause.

## IV. CONCLUSION

For all the reasons set forth above, we will vacate the order entered by the District Court and remand for further proceedings consistent with this opinion.

PORTER, *Circuit Judge*, concurring in part and concurring in the judgment.

I agree with the majority's judgment and much of its reasoning. I write separately, however, to explain why Uber's proposed goods-versus-passenger distinction does not track the plain language of § 1 of the Federal Arbitration Act ("FAA"), and to address some issues left on remand.

I

This appeal asks whether § 1's residual clause—"any other class of workers engaged in foreign or interstate commerce"—includes workers who transport other people, or only workers who transport physical goods. The majority holds that it includes all transportation workers, no matter who (or what) they transport. I concur, but I would reach this conclusion for a different, simpler reason.[1]

---

[1] The majority asserts that this Court answered this question long ago, citing three of our decisions from the early 1950s. *See* Maj. Op. 14–15 (citing *Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emp., Local Div. 1210 v. Pa. Greyhound Lines* ("*Greyhound I*"), 192 F.2d 310 (3d Cir. 1951); *Pa. Greyhound Lines v. Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emp., Div. 1063* ("*Greyhound II*"), 193 F.2d 327 (3d Cir. 1952); *Tenney Eng'g, Inc. v. United Elec. Radio & Mach. Workers, (U.E.) 437*, 207 F.2d 450 (3d Cir. 1953)). I disagree that these cases answer the specific question presented here.

*Greyhound I* addressed whether a collective bargaining agreement was a "contract of employment" under § 1's exemption. 192 F.2d at 313. We held that it was. *Id.* We also noted that, "while the situation existing in cases of seamen and railroad employees clarifies the meaning of the statute[,] its terms also include 'any other classes of workers' in interstate commerce." *Id.* at 313–14. The labor union of bus-line employees, we said, was "[s]uch a class." *Id.* at 314. Three months later, in *Greyhound II*, we addressed the same question for a "similar contract and a similar class of workers," and compelled the same result. 193 F.2d at 328.

*Tenney* addressed the issue decided nearly fifty years later in *Circuit City*: "whether [the plaintiff]'s employees, who

1

When we interpret a statute, we start with its text. *See, e.g.*, *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 131 (3d Cir. 2017). Section 1 exempts from the FAA's reach "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. On its face, nothing in this text states any sort of goods-passengers distinction.

Uber suggests that the phrase "engaged in foreign or interstate commerce" is limited to the transportation of only

are engaged in the manufacture of goods for commerce and plant maintenance incidental thereto, are to be regarded as a 'class of workers engaged in foreign or interstate commerce' within the meaning of the exclusionary clause." *See* 207 F.2d at 452. Presaging the Supreme Court in *Circuit City*, we held that the residual clause "include[s] only those other classes of workers who are likewise engaged directly in commerce[.]" *Id.* And that meant "only those other classes of workers who are actually engaged in the movement of interstate or foreign commerce or in work so closely related thereto as to be in practical effect part of it." *Id.* In so holding, we distinguished the two *Greyhound* cases, "the bus line employees in those cases being directly engaged in the channels of interstate transportation just as are railroad workers." *Id.* at 453.

None of these cases addressed the specific goods-versus-passengers question presented here. At most, they might have assumed an answer. But it is nowhere evident that the parties in those cases ever crossed swords on this issue, which makes dictum of any discussion or implication from us on the point. Nor did we state or imply that we had forever settled the limits of § 1's residual clause. So although generally we are bound by earlier precedential decisions of this Court, I would not turn sixty-year-old assumptions into binding precedent. *See Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 363 (2006) ("[W]e are not bound to follow our dicta in a prior case in which the point now at issue was not fully debated."); *Lopez v. Monterey Cty.*, 525 U.S. 266, 281 (1999) ("[T]his Court is not bound by its prior assumptions."); *Brecht v. Abrahamson*, 507 U.S. 619, 630–31 (1993) (holding that when the Court has "never squarely addressed the issue, and [has] at most assumed the [legal conclusion], we are free to address the issue on the merits").

2

material goods. But that is nowhere in the provision's plain language. Instead, Uber would have us impliedly limit the meaning of "commerce" in § 1 to the transportation of only physical goods. That argument fails.

First, the term "commerce" is not normally limited to the transportation of only physical goods, especially when linked to Congress's power under the Commerce Clause.[2] *See Edwards v. California*, 314 U.S. 160, 172 (1941) ("[I]t is settled beyond question that the transportation of persons is 'commerce', within the meaning of that provision."); *United States v. Hill*, 248 U.S. 420, 423 (1919) ("[C]ommerce has been held to include the transportation of persons and property no less than the purchase, sale and exchange of commodities."); *Hoke v. United States*, 227 U.S. 308, 320 (1913) ("Commerce among the states, we have said, consists of intercourse and traffic between their citizens, and includes the transportation of persons and property.").[3]

Second, Uber's interpretation would give "commerce" a different meaning in § 1 than it has in § 2. The latter invokes Congress's Commerce Clause power to set the broad reach of

---

[2] This was the dominant understanding of "commerce" when Congress passed the FAA in 1925. *See, e.g.*, *Commerce*, Bouvier's Law Dictionary & Concise Encyclopedia (8th ed. 1914) ("The term 'commerce' comprehends more than a mere exchange of goods; it embraces commercial intercourse in all its branches, including transportation of passengers[.]"); *Commerce*, Black's Law Dictionary (2d ed. 1910) ("Intercourse by way of trade and traffic between different peoples or states and the citizens or inhabitants thereof, including … the transportation of persons as well as of goods, both by land and by sea."); Henry C. Black, Handbook of American Constitutional Law § 104, at 189 (2d ed. 1897) ("[Commerce] is not limited to the transportation of freight, but extends equally to passenger traffic.").

[3] In fact, the issue here is analogous to that presented long ago in *Gibbons v. Ogden*, 22 U.S. 1 (1824). There, the Supreme Court held that "commerce" is more than the mere "interchange of commodities," but includes passenger transport by steamboat. *See id.* at 189.

3

the FAA: "A written provision in … a contract evidencing a transaction *involving commerce* to settle by arbitration a controversy…." 9 U.S.C. § 1 (emphasis added); *see Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 277 (1995) (holding that, in § 2, the phrase "involving commerce" shows Congress's "intent to exercise [its] commerce power to the full"). Section 1, in turn, carves out certain contracts from the FAA's scope: "nothing herein contained shall apply to contracts of employment of … any other class of workers *engaged in … interstate commerce*." 9 U.S.C. § 1 (emphasis added).

The Supreme Court has ascribed different meanings to the modifiers "involving" in § 2 compared with "engaged in" in § 1—the latter reflecting a "narrower" exercise of Congress's power—but the nature of the "commerce" in both sections is the same. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115, 118 (2001) ("The plain meaning of the words 'engaged in commerce' is narrower than the more open-ended formulations 'affecting commerce' and 'involving commerce.'" (citation omitted)). Indeed, it must be the same because the Court held the subject constant to interpret the differing modifiers. *See id.* at 115–17. And rightly so, given that identical words in the same statute usually have identical meanings. *See United States v. EME Homer City Generation, L.P.*, 727 F.3d 274, 294 (3d Cir. 2013) (citing *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005)); *United States v. Torres*, 383 F.3d 92, 102 (3d Cir. 2004).

Uber concedes (as it must) that "commerce" in § 2 includes the transportation of passengers. (Otherwise, Uber would be unable to invoke the FAA in the first place.) Having thus conceded, Uber undermines its contention that "commerce" in § 1 does not also include passenger-transporting activities. In short, the plain language of the FAA does not allow for the implied distinction Uber tries to draw.

II

After deciding that passenger-transporting drivers may fit within § 1's exemption, the majority declares that its analysis has ended. Yet the majority continues in section III.B.2 to discuss in detail aspects of the issue that we are

4

remanding: whether Singh belongs to a "class of workers engaged in … interstate commerce." 9 U.S.C. § 1. The majority says this question "can be informed by various factors," and directs the District Court to permit discovery "before entertaining further briefing." Maj. Op. 29. In my view, this discussion is unmoored from relevant precedent, tends to undermine settled principles of arbitration, and may unnecessarily cloud the remaining issues on remand. So I do not join section III.B.2 of the majority's opinion, but write separately to make two points.

First, I disagree that the parties must jump right into discovery on remand. The Supreme Court has repeatedly emphasized that "[t]he [FAA] calls for a summary and speedy disposition of motions or petitions to enforce arbitration clauses." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 29 (1983); *see id.* at 22 (noting "Congress's clear intent, in the [FAA], to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible."). In light of this overarching goal and the parties' clear agreement to arbitrate their disputes, if there exists a valid alternative basis on which the District Court could compel arbitration, it may be more efficient to decide that question first, before allowing discovery on the § 1 issue. *See, e.g.*, *Palcko v. Airborne Exp., Inc.*, 372 F.3d 588, 596 (3d Cir. 2004) (enforcing FAA-exempt arbitration agreement under state law); *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1472 (D.C. Cir. 1997) ("[W]e have little doubt that, even if an arbitration agreement is outside the FAA, the agreement still may be enforced and the arbitrator's award still may be subject to judicial review."); *Valdes v. Swift Transp. Co., Inc.*, 292 F. Supp. 2d 524, 528–29 (S.D.N.Y. 2003) (collecting cases); *Mason-Dixon Lines, Inc. v. Local Union No. 560, Int'l Bhd. of Teamsters*, 443 F.2d 807, 809 (3d Cir. 1971) ("In our view, the effect of Section 1 is merely to leave the arbitrability of disputes in the excluded categories as if the Arbitration Act had never been enacted.").

Second, our decision here does not allow for wide-ranging discovery whenever the § 1 exemption is at issue. The majority seems equivocal on this point—describing the relevant inquiry as both "restricted" and informed by "a wide variety of sources." Maj. Op. 11, 29. But abundant precedent

5

makes clear that any discovery on factual predicates to arbitration must be a narrow, focused examination. *See, e.g.*, *Moses H. Cone*, 460 U.S. at 22–23 (allowing "only restricted inquiry into factual issues"); *Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764, 774 (3d Cir. 2013) (allowing only "limited discovery" on a "narrow issue" (internal quotation marks and citation omitted)); *cf. Blair v. Scott Specialty Gases*, 283 F.3d 595, 609 (3d Cir. 2002) ("[D]iscovery is ordinarily not undertaken at such an early stage of a proceeding that is governed by an arbitration agreement.").

The need to limit any pre-arbitration discovery is amplified here because of the shifted burden of proof and the open legal question of what it means to belong to a "class of workers engaged in … interstate commerce" under § 1. In *Guidotti*, for example, the discovery focused on whether the parties had specifically agreed to the arbitration clause at issue. That was a well-defined factual question governed by definite state-law contract principles. *See* 716 F.3d at 780. In that and similar situations, the burden of proof stays with the party seeking arbitration, which provides a natural incentive for efficient discovery and motions practice. *See, e.g.*, *Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015).

Here, by contrast, things are reversed. Singh bears the burden on remand to show why the District Court should should not compel arbitration under the FAA, which may create inefficient incentives in discovery. *See Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000) ("[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration."); *Gay v. CreditInform*, 511 F.3d 369, 379 (3d Cir. 2007); *Johnson v. W. Suburban Bank*, 225 F.3d 366, 370–71 (3d Cir. 2000). And the contours of the § 1 question—whether Singh belongs to a "class of workers engaged in … interstate commerce"—remain undefined: Singh has not yet attempted to define the relevant § 1 "class of workers," and his affidavit that triggers our extension of *Guidotti* asserts only that *he* drove passengers from the Newark Airport to New York.

For these reasons, although I concur in the judgment and agree with much of the majority opinion, I do not join section III.B.2.