**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-2614
_____

ROBERT HARPER

v.

AMAZON.COM SERVICES, INC.;
JOHN DOES 1-5 AND 6-10

AMAZON.COM SERVICES, INC.,
Appellant
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 3:19-cv-21735)
District Judge: Honorable Freda L. Wolfson
_____

Argued March 16, 2021

Before: SHWARTZ, PORTER, MATEY, *Circuit Judges*.

(Filed: September 8, 2021)

Gabrielle Levin
Gibson, Dunn & Crutcher LLP
200 Park Avenue
47th Floor
New York, NY 10166

Jason C. Schwartz (Argued)
Lucas C. Townsend
Joshua M. Wesneski
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
        *Counsel for Appellant*

Steven P. Lehotsky
Jonathan D. Urick
U.S. Chamber Litigation Center
1615 H Street, N.W.
Washington, DC 20062

Archis A. Parasharami
Daniel E. Jones
Mayer Brown LLP
1999 K Street, N.W.
Washington, DC 20006-1101
        *Counsel for Amicus Curiae in Support of Appellant,*
        *The Chamber of Commerce of the United States of*
        *America*

Deborah L. Mains (Argued)
Costello & Mains, LLC
18000 Horizon Way
Suite 800
Mount Laurel, NJ 08054
*Counsel for Appellee*

———————————

## OPINION OF THE COURT

———————————

MATEY, *Circuit Judge*.

Robert Harper spends part of his time making deliveries for Amazon as a "flexible" driver, one of those once unknown, now ubiquitous, jobs of the twenty-first century.[1] Harper alleges Amazon owes him wages and tips. Perhaps they do. But before answering that question, the District Court must first ask another: whether Harper's claims belong in arbitration. This inquiry, as we hold today, respects the balance of authority between the several States and the United States and requires federal courts sitting in diversity to decide state law claims, including state arbitrability, even where the Federal Arbitration

———————————

[1] Amazon uses the "Amazon Flex" program to supplement its traditional delivery services by contracting with drivers for local deliveries in certain U.S. metro areas. https://flex.amazon.com/faq. Through a smartphone app, individuals sign up to make "last mile" deliveries of products from Amazon warehouses. (Opening Br. at 6.) Flex drivers also deliver groceries through Prime Now and Amazon Fresh and takeout from local restaurants through Instant Offers. https://flex.amazon.com/faq.

Act ("FAA") may apply. Doing so promotes both the competitive and cooperative aspects of Our Federalism, with appropriate "sensitivity to the legitimate interests of both State and National Governments." *Younger v. Harris*, 401 U.S. 37, 44 (1971). That is a threshold inquiry, ensuring prompt review of state law claims, particularly before turning to discovery to sort through a comparatively complex federal question. For that reason, we will vacate the District Court's judgment and remand to determine the arbitrability of Harper's claim against Amazon under applicable state law.

## I.    BACKGROUND

Robert Harper runs deliveries for Amazon under the "Amazon Flex" program. (App. at 44.) Amazon Flex supplements Amazon's traditional delivery services. Interested drivers use an app to sign up to drive packages from Amazon warehouses, affiliated grocers, and participating restaurants to home shoppers.

Harper signed up as a driver through the Amazon Flex phone app, where he clicked on a brightly colored button stating, "I AGREE AND ACCEPT" (in all caps) following the Terms of Service. (Opening Br. at 7.) The Terms noted, with still more capitalization, that the Amazon Flex driver who accepts:

> AGREE[S] TO RESOLVE DISPUTES BETWEEN YOU AND AMAZON ON AN INDIVIDUAL BASIS THROUGH **FINAL AND BINDING ARBITRATION**, UNLESS YOU OPT OUT OF ARBITRATION WITHIN

4

14 CALENDAR DAYS OF THE EFFECTIVE DATE OF THIS AGREEMENT.[2]

(App. at 62.) The Terms of Service also included language specifying that the parties "agree[d] that the Federal Arbitration Act and applicable federal law will govern any dispute that may arise between the parties." (App. at 67.) And a choice-of-law provision provided that Washington law controls the rest of the Terms of Service. Harper admits that he agreed, clicking first to accept the full Terms and clicking again to confirm the arbitration clause. Still, he filed a complaint in the Superior Court of New Jersey, alleging violations of New Jersey law. Amazon removed to federal court, claiming complete diversity. Pressing on, Harper filed a putative class action on behalf of similarly situated New Jersey Amazon Flex drivers, alleging that Amazon misclassified them as independent contractors when they really are employees,

---

[2] Section 11(a) of the Terms of Services, labeled "Dispute Resolution, Submission to Arbitration," explains that "subject to your right to opt out of arbitration, the parties will resolve by final and binding arbitration, rather than in court, any dispute or claim, whether based on contract, common law, or statute, arising out of or relating in any way to this agreement, including termination of this agreement, . . . to your participation in the program or to your performance of services." (App. at 66.) Section 11(b) adds that "to the extent permitted by law, the parties agree that any dispute resolution proceedings will be conducted only on an individual basis and not on a class or collective basis." (App. at 66.) For added punch, both sections also appear in ALL CAPS, an extravagant stylistic choice we omit for the reader's ease.

and that Amazon failed to pay overtime, minimum wage, and customer tips, in violation of New Jersey labor laws.

Amazon moved to enforce the arbitration clause in the Terms and compel arbitration under the FAA. Harper objected, arguing that New Jersey Amazon Flex drivers fall within the exemption for a "class of workers engaged in foreign or interstate commerce" provided in 9 U.S.C. § 1 because they make some deliveries across state lines. Amazon disagreed with that construction of federal law. But no matter, the company added, because the claim is also arbitrable under state law. Interpreting our prior decisions, the District Court denied Amazon's motion to compel arbitration. Construing the issue as one of fact, the District Court ordered discovery to determine whether Harper falls within the § 1 exception to the FAA by, among other acts, making deliveries from New Jersey to New York. The District Court declined to reach Amazon's alternative argument about state law, and Amazon timely appealed.[3]

---

[3] The District Court exercised jurisdiction under 28 U.S.C. §§ 1332(a) and 1332(d)(2). We have jurisdiction over this appeal of an order denying the motion to compel arbitration under 9 U.S.C. § 16(a)(1)(B). We have pendent jurisdiction over whether arbitration may be compelled under state law when "state law issues arise from a single arbitration agreement that provides alternative grounds for the arbitration of all claims." *Palcko v. Airborne Express, Inc.*, 372 F.3d 588, 594 (3d Cir. 2004). Review of these state law issues "is necessary to ensure meaningful review of the District Court's order in its entirety." *Id.* at 595. We review the District Court's order compelling arbitration de novo. *Singh v. Uber Techs.*

## II. DISCUSSION

Congress limited the scope of the FAA by exempting the employment contracts of certain classes of workers engaged in foreign or interstate commerce. Whether that exemption applies is a question of law that, ordinarily, does not require fact-finding through discovery. Nor does the FAA require courts to ignore state law grounds for enforcing an agreement to arbitrate. Both issues require more consideration by the District Court on remand.

### A.    Section 1 of the FAA

The FAA does not apply "to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. It is a "very particular qualification" attributed to pre-existing "alternative employment dispute resolution regimes for many transportation workers." *New Prime, Inc. v. Oliveira*, 139 S. Ct. 532, 537 (2019). Adding to § 1's language, we have applied the exception to cover employees in any transportation industry who "engage[] in the movement of interstate or foreign commerce or in work so closely related thereto as to be in practical effect part of it." *Tenney Eng'g, Inc. v. United Elec. Radio & Mach. Workers of Am., (U.E.) Local 437*, 207 F.2d 450, 452 (3d Cir. 1953) (en banc). Since then, the Supreme Court has cautioned courts to "construe the 'engaged in commerce' language in the FAA with reference to the statutory

_____

*Inc.*, 939 F.3d 210, 217 (3d Cir. 2019). In doing so, "[w]e apply the same standard as the District Court, so we are first obliged to determine which standard should have been applied [in reviewing the arbitration award]." *Id.* (internal quotation omitted).

7

context in which it is found and in a manner consistent with the FAA's purpose." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 118 (2001). Applying this framework, the Court has held "that the § 1 exclusion provision [should] be afforded a narrow construction." *Id.*; *see also Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 800–02 (7th Cir. 2020).

Equally important, the "inquiry regarding § 1's residual clause asks a court to look to classes of workers rather than particular workers." *Singh v. Uber Techs., Inc.*, 939 F.3d 210, 227 (3d Cir. 2019); *see also Wallace*, 970 F.3d at 800 (Section 1 asks "not whether the individual worker actually engaged in interstate commerce, but whether the class of workers to which the complaining worker belonged engaged in interstate commerce." (quotation marks and emphasis omitted)). That limitation flows from the ordinary meaning of § 1, which includes the "other class of workers engaged in . . . commerce" as a "residual phrase, following, in the same sentence, explicit reference to 'seamen' and 'railroad employees.'" *Circuit City*, 532 U.S. at 114.

Determining whether § 1's exclusion applies is a threshold inquiry because "a court must first know whether the contract itself falls within or beyond the boundaries of §§ 1 and 2." *New Prime*, 139 S. Ct. at 537. Doing so requires construing the ordinary meaning of § 1, as interpreted by our decisions,[4] a

---

[4] A line of cases dating to the 1953 en banc decision in *Tenney* holds that § 1 exempts all transportation-industry employees who engage in "work so closely related [to interstate or foreign commerce] as to be in practical effect part of it" from the FAA's reach. 207 F.2d at 452. Later, our Court reaffirmed *Tenney*'s construction of § 1 while concluding that

question of law that typically can be resolved without facts outside the well-pleaded complaint. *Singh*, 939 F.3d at 219 (discussing *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764 (3d Cir. 2013)). That inquiry turns on multiple factors informing the sort of "work so closely related" to interstate or foreign transportation, such as the parties' agreement, and the "industry in which the class of workers is engaged." *Id.* at 227–28. And "when it is apparent, based on the face of a complaint, and documents relied upon in the complaint, that certain of a party's claims are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay." *Guidotti*, 716 F.3d at 776 (internal quotation marks omitted). But in some cases, where the scope of the class of workers at issue cannot be determined by examining the nature of the work performed by the class, and by comparison to the rail and sea industries specified by Congress, "limited discovery" "restricted" to facts about the class of workers may be ordered. *Singh*, 939 F.3d at 218–19. Here, the District Court held Harper met the *Singh* standard for discovery. Following that path is understandable, and

---

a Philadelphia-area supervisor for an international shipping company was a "transportation worker engaged in interstate and foreign commerce" exempt from the FAA. *Palcko*, 372 F.3d at 593–94. Most recently, *Singh* described *Tenney* as "unequivocal that the residual clause of § 1 excludes the contracts of employment of transportation workers who transport passengers from the FAA." *Singh*, 939 F.3d at 222. All drawing a straight line from *Tenney* to Harper's argument that Amazon Flex drivers making local, last-few-mile-only deliveries are "workers engaged in foreign or interstate commerce."

9

discovery may indeed show whether Harper belongs to a class of workers engaged in foreign or interstate commerce in the same way as seamen and railroad workers. But when state law grounds exist that would enforce arbitration even if the FAA does not apply, courts must turn to that threshold question under *Guidotti* before ordering discovery. Doing so honors the principles of federalism and the expectations of the parties. We turn next to those concepts.

## B.     The Co-Equal Role of Arbitration Under State Law

Assume, Amazon argues, that the § 1 exemption applies. If so, the parties might still have an enforceable agreement to arbitrate under state law. And if that is so, then why not answer that question of law before turning to discovery, mindful that fact-finding can always come later if necessary? We agree and hold this question must be resolved before turning to discovery.

### 1.     The Scope of FAA Preemption

Begin with the scope of FAA preemption in § 2 of the Act.[5] Not all state laws, only laws that conflict with the FAA, are "displaced." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 341 (2011). A state law enforcing arbitration, like New Jersey's Arbitration Act ("NJAA"), creates no conflict. *See Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 445–46 (2006); *Volt Info. Sci., Inc. v. Bd. of Trs. of Leland Stanford*

---

[5] 9 U.S.C. § 2 states that agreements to arbitrate "in any maritime transaction or a contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

10

*Junior Univ.*, 489 U.S. 468, 474 (1989). That is because "pre-emption analysis is not a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives, but an inquiry into whether the ordinary meanings of state and federal law conflict." *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 459 (2005) (Thomas, J., concurring in the judgment in part and dissenting in part) (internal quotation marks and citation omitted). In short, "[t]he FAA contains no express pre-emptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration." *Volt*, 489 U.S. at 477. As with nearly all aspects of our republic, state and federal law here complement, rather than conflict.

That balance is seen here. If the § 1 exclusion applies, then the FAA does not. But the parties still have an agreement to arbitrate, and if federal law does not govern the arbitrability of their contract, *some* law must.

2.      Choosing the Applicable Law

So what law applies? The agreement between Harper and Amazon answers that question or, at least, it tells us how the question will be answered. Recall how the agreement came to be. Working under the Amazon Flex program starts with a downloaded app and a few clicks. To join, willing drivers must accept the Terms of Service, agreeing to "resolve disputes" with Amazon "through final and binding arbitration." (App. at 62.) The Terms of Service state that "the Federal Arbitration Act and applicable federal law will govern any dispute that may arise between the parties." (App. at 67.) Everything else is governed by Washington law. (*See* App. at 67.) The Terms of Service are severable, and "[i]f any provision of th[e] Agreement is determined to be unenforceable," the rest of the agreement must "be enforced as if the unenforceable

11

provisions were not present [such] that any partially valid and enforceable provisions [are] enforced to the fullest extent permissible under applicable law." (App. at 68.)

In this language, Harper sees a hole that defeats the parties' bargain. He argues that because the agreement selects the FAA to govern arbitration, there is no law to apply if the § 1 exemption takes the FAA out. Two problems arise from that contention. First, state law grounds for arbitration may exist. Generally, a court can only determine *whether* state law provides grounds for arbitration by deciding *what* state law applies using the rules of the forum state. *Gen. Ceramics Inc. v. Firemen's Fund Ins. Companies*, 66 F.3d 647, 652 (3d Cir. 1995) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)). That is because our federal system "leaves to a state, within the limits permitted by the Constitution, the right to pursue local policies diverging from those of its neighbors." *Klaxon*, 313 U.S. at 496. When engaging in substantive contractual interpretation, a federal court must look to the choice-of-law rules of the forum state, even where the contract includes a choice-of-law clause. *Collins v. Mary Kay, Inc.*, 874 F.3d 176, 183 (3d Cir. 2017). That duty remains when the FAA is part of the contract because "[t]here is no language in the FAA that explicitly preempts the enforcement of state arbitration statutes." *Palcko*, 372 F.3d at 595. Finding the § 1 exemption applies does not mean all state law about arbitration vanishes. "[E]ven if an arbitration agreement is outside the FAA, the agreement still may be enforced." *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1472 (D.C. Cir. 1997).

Second, and specifically, the Terms of Service need not be read to hinge arbitrability on the application of federal law. Equally plausible is a reading that creates an obligation to

12

arbitrate all disputes and a separate, possibly severable, choice of federal law.[6] One term need not depend on the other.

Of course, that does not mean Washington law controls, or that Harper and Amazon have an agreement to arbitrate under state law at all. These are questions best considered by the District Court. *See Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."). A remand to fully consider arbitration under state law grounds is appropriate and, it turns out, agreeable to the parties.[7] More importantly, it is what federalism requires of a federal court sitting in diversity jurisdiction on a state law claim.

---

[6] Looking at this same contract, two circuits so far have reached opposite conclusions on the severability question. *Compare Waithaka v. Amazon.com, Inc.*, 966 F.3d 10, 27 (1st Cir. 2020) ("Amazon's shortcomings in drafting the Agreement do not alter our ultimate conclusion . . . . Because the FAA is inapplicable, the portions of the governing law and dispute resolution sections selecting the FAA must be stricken from the Agreement, leaving Washington law as the default choice of law . . . ."), *with Rittman v. Amazon.com, Inc.*, 971 F.3d 904, 920 (9th Cir. 2020) ("Because it is not clear that the parties intended to apply Washington law to the arbitration provision in the event the FAA did not apply, we construe ambiguity in the contract against Amazon to avoid that result.").

[7] As acknowledged by the parties at argument. (Transcript of Oral Argument at 23–28, *Harper v. Amazon.com Services Inc.*, No. 20-2614 (3d Cir. March 16, 2021), ECF No. 42.)

3. State Law Questions of Arbitrability Should Be Resolved First

Finally, state law arbitration questions must be resolved before turning to questions of fact and discovery.[8] Fairly, the District Court opted to resolve the applicability of the FAA before diving into a choice-of-law analysis. That sequencing

---

[8] Our dissenting colleague argues that "binding precedent supports the sequence that the District Court followed." (Dissent at 3.) We agree that it was proper to assess the FAA's applicability in the first instance. But no binding precedent requires district courts to ignore arbitrability under state law when the applicability of § 1 is uncertain. That sequencing question was asked, but not answered by the First Circuit in *New Prime*. *Oliveira v. New Prime, Inc.*, 857 F.3d 7, 24 (1st Cir. 2017), *aff'd*, 139 S. Ct. 532 (2019). And the Supreme Court in *New Prime* did not discuss, let alone decide, the matter. Rather, the Court outlined the order of analysis for FAA provisions and doctrines, but said nothing about when state law arbitrability must be addressed. 139 S. Ct. at 537–38 (holding that §§ 1 & 2 come before §§ 3 & 4 and the FAA's "severability" doctrine). Indeed, no court has suggested that *New Prime* requires that we determine "whether [§ 1] applies before turning to state law." (Dissent at 4.) Nor have we previously addressed how district courts should consider state law arbitrability when faced with a cloud of § 1 uncertainty. The issue did not arise in *Palcko*, where we affirmed the district court's conclusion that the contract was exempt under § 1 before turning to state law. 372 F.3d at 594–96. And sequencing was not before us in *Singh* either, *see* 939 F.3d at 228, although the concurrence flagged the issue. *Id.* at 231 (Porter, J., concurring in part and concurring in the judgment).

replaces a possibly challenging set of legal questions with an almost certainly burdensome set of factual disputes and opens the door to the delays, costs, and uncertainty an enforceable arbitration clause seeks to avoid. *Guidotti*, incorporated into the analysis of the § 1 claims in *Singh*, counsels a different course.

Recall that *Singh* adopts the test outlined in *Guidotti*, requiring courts to resolve a motion to compel arbitration "under a Rule 12(b)(6) standard without discovery's delay" when only facts alleged in the complaint are sufficient for a decision as a matter of law. *Guidotti*, 716 F.3d at 776 (internal quotation marks omitted). In challenges to arbitrability under § 1, that creates a three-part framework. At step one, using the traditional tools of statutory interpretation to analyze the facts of the complaint, a court must consider whether the agreement applies to a class of transportation workers who "engaged directly in commerce" or "work so closely related thereto as to be in practical effect part of it." *Tenney*, 207 F.2d at 452. If the class is outside that definition, then § 1 does not apply, and cannot serve as a defense to a motion to compel arbitration. If that analysis leads to murky answers, a court moves to step two and assumes § 1 applies, taking the FAA out of the agreement. But the court then considers whether the contract still requires arbitration under any applicable state law. After all, the parties' primary agreement is to arbitrate their disputes, so courts should explore both contractual routes to effectuate that agreement when one is called into question. If the arbitration clause is also unenforceable under state law, then the court reaches step three, and must return to federal law and decide whether § 1 applies, a determination that may benefit from limited and restricted discovery on whether the class of workers primarily engage in interstate or foreign commerce.

15

### III.   CONCLUSION

Reasonably, the District Court focused on the facts surrounding the class of workers to which Harper belongs. Our decision today clarifies the steps courts should follow—before discovery about the scope of § 1—when the parties' agreement reveals a clear intent to arbitrate. We reiterate that our decision does not suggest any particular view of the parties' agreement, only the route to follow. Whether Harper and Amazon must arbitrate their dispute is a matter of both federal and state law, an analysis best considered by the District Court. For these reasons, we will vacate the order denying the motion to compel arbitration and remand for consideration under state law.

MATEY, *Circuit Judge*, concurring.

Nearly a century has passed since Congress codified the ancient practice[1] of arbitration. Since then, federal courts have engaged in a tug-of-war that expands both the reach of, and the exceptions to, the Federal Arbitration Act ("FAA"). The result is uncertainty, with the text drafted by Congress replaced by presumptions that encourage unpredictability and foster rising costs. Respectfully, since the courts created this problem, we should help clean it up. Some have already called for an examination of the presumption amplifying the modest command that an agreement to resolve a controversy through arbitration "shall be valid, irrevocable, and enforceable"[2] into a wide-ranging displacement of private agreements and state law. *See Calderon v. Sixt Rent a Car*, *LLC*, 5 F.4th 1204, 1215–21 (11th Cir. 2021) (Newsom, J., concurring). An expansion that may well run directly into the textual guarantee of trial rights.[3] Returning § 2 to its ordinary, best meaning could avoid that tension and restore the FAA to its stated reach.

---

[1] *See* 14 Sir William S. Holdsworth, History of English Law 187 (1964) ("Early Roman and English law retain traces of the time when the natural way of settling disputes was self-help, and recourse to a court depended on the consent of the parties.") And this "process of jury-avoidance" continued "into the colonial era." Renée Lettow Lerner, The Failure of Originalism in Preserving Constitutional Rights to Civil Jury Trial, 22 Wm. & Mary Bill Rts. J. 811, 845 & n.227 (2014).

[2] 9 U.S.C. § 2.

[3] "It has been often said by this court that the trial by jury is a fundamental guaranty of the rights and liberties of the people. Consequently, every reasonable presumption should be

Similarly, reconsidering our decision in *Tenney Eng'g, Inc. v. United Elec. Radio & Mach. Workers of Am., (U.E.) Local 437*, 207 F.2d 450 (3d Cir. 1953) (en banc) presents an opportunity to return the exception in 9 U.S.C. § 1 to its textual parameters. Writing in a different era, and relying on analogy to the different formulation of the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 (1908), *Tenney*'s construction of § 1 sweeps in a broader class of workers from a wider range of industries than the text allows. And with the rise of Internet-based commerce, *Tenney*'s command to examine whether the work at issue is "closely related" to the transportation of interstate commerce could eventually make the exception to arbitration the new rule.

---

indulged against its waiver." *Hodges v. Easton*, 106 U.S. (16 Otto) 408, 412 (1882). Contrast this with the presumption, found nowhere in the text of the FAA, "that questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration" because the Act "establishes that, as a matter of federal law any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24–25 (1983). Instead, the presumption appears drawn from portions of legislative history. *See Southland Corp. v. Keating*, 465 U.S. 1, 13–14 (1984). That might explain much of the haze that now covers the text. *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019) ("Even those of us who sometimes consult legislative history will never allow it to be used to 'muddy' the meaning of 'clear statutory language.'" (quoting *Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011))).

2

Reconsidering the judicially created presumptions atop both §§ 1 and 2 of the FAA would bring everyone back to the starting line in the text of the law. And applying the text as written will allow Congress to consider whether new words are needed about the scope of arbitration in the twenty-first century.

## I.    DETERMINING THE BEST READING OF 9 U.S.C. § 1

While the challenges presented by the judicially magnified presumptions of § 2 deserve a fresh look, that issue is not before us. The similarly stretched scope of § 1 is. And since our distant decision in *Tenney* seems to be at the root of more recent expansions of the exception, its reconsideration is warranted.

## A.    The Ordinary Path of Interpretation

In drafting the FAA, Congress included a specific exception for "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Normally, we approach the work of statutory construction with a single mission to "interpret the words consistent with their ordinary meaning . . . at the time Congress enacted the statute." *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) (alteration in original) (internal quotation marks omitted); *see also United States v. Smukler*, 991 F.3d 472, 482–83 (3d Cir. 2021). Context aids that mission, as "the meaning of a sentence [is] more than that of the separate words, as a melody is more than the notes." *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1827 (2020) (Alito, J., dissenting). As the Supreme Court has repeatedly directed, any matter of statutory interpretation comes with "an important caution in mind" that "if judges

3

could freely invest old statutory terms with new meanings, we would risk amending legislation outside the 'single, finely wrought and exhaustively considered, procedure' the Constitution commands." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) (quoting *INS v. Chadha*, 462 U.S. 919, 951 (1983)).

**B.    *Tenney*'s Analogy**

But sometimes a prior judicial decision colors our conclusions. *See United States v. Games-Perez*, 667 F.3d 1136, 1142–43 (10th Cir. 2012) (Gorsuch, J., concurring in the judgment). That is the case with § 1 and the nearly seven-decade-old decision in *Tenney*, involving a suit by a manufacturer against a labor union for breach of contract. The contract included an arbitration clause, a right invoked by the union. Seeking to avoid arbitration, the employer argued the workers fell under § 1 exemption. 207 F.2d at 452. *Tenney* answered that question not through textual construction, but by analogy, looking to the definition of "commerce" in FELA. *Id.* at 453. *Tenney* concluded Congress "must have had [FELA] in mind" when drafting the residual clause in § 1 of the FAA, given that Congress "incorporat[ed] almost exactly the same phraseology," that is, "engaged in commerce" and "engaged in interstate commerce," respectively. *Id. Tenney* then applied a test from a single FELA case to expand the inquiry from whether the employee was engaged in interstate transportation to whether the employee was engaged in interstate transportation *or in work so closely related to it as to be practically a part of it*. *Id.* (citing *Shanks v. Del., Lackawanna & W. R. Co.*, 239 U.S. 556, 558 (1916)).

As a result, the exception for "seamen, railroad employees, or any other class of workers engaged in foreign or

interstate commerce" now applies to *all* employees in *any* industry who "engage in interstate commerce" or "work so closely related thereto as to be in practical effect part of it." *Id.* at 452. *See also Singh v. Uber Techs., Inc.*, 939 F.3d 210, 227–28 (3d Cir. 2019) (creating a multifactor test to answer the calculation posed by the *Tenney* formula). And that is the path courts now understandably follow into discovery to figure out what is, or is not, closely related to the increasingly borderless commercial world. With digital platforms providing consumers access to a global selection of goods and services, that inquiry seems likely to stump both district courts and litigants. Indeed, one might ask whether even the most local of main-street shops that elects to sell its goods, advertise its services, or collect its payments electronically is instantly transformed into "foreign or interstate commerce." What do we say when the local package store signs up to deliver alcohol through Drizly to customers ordering online but living blocks away?[4] If hard questions about the scope of the FAA arise from

---

[4] Drizly recruits local stores to provide alcohol to "millions of customers looking to buy online from their local liquor store and get delivery to their door." Become a Drizly Retail Partner, https://bevalcinsights.com/become-a-drizly-retail-partner (last visited Sept. 2, 2021). During the COVID-19 pandemic, Drizly became the "favorite on-demand alcohol delivery service" known for their speed, large selection, and also "local picks from each area they're in — including local breweries, tasting rooms, and distilleries." Taylor Galla, Tyler Schoeber, & Nina Bradley, *The Best Alcohol Delivery Services to Ensure You'll Never Be Without Your Favorite Booze*, Yahoo, Aug. 6, 2021, https://www.yahoo.com/lifestyle/best-alcohol-delivery-services-ensure-200014005.html.

5

enjoying a six-pack, it seems fair to ask whether we are on the right road.

## C.    The Text of the FAA

There is, however, a better route drawn only from the text of the FAA. Remembering that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme," *Parker Drilling Mgmt. Servs. v. Newton*, 139 S. Ct. 1881, 1888 (2019) (quoting *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012)), I would examine the ordinary meaning of the § 1 exclusion in the context of the FAA.

### 1.    Congress Drafted § 1 to Accommodate Existing Federal Laws

Recall the somewhat unusual phrasing of § 1: "nothing" in the FAA "shall apply" to "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." A precise definition, the exclusion is written to harmonize the "alternative employment dispute resolution regimes for many transportation workers" Congress created before adopting the FAA in 1925. *New Prime*, 139 S. Ct. at 537 (discussing *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 121 (2001)). We know that because "[t]he wording of § 1 calls for the application of the maxim *ejusdem generis,* the statutory canon that where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Circuit City*, 532 U.S. at 114–15 (cleaned up). Using this "maxim," that residual clause of "any other class of workers engaged in . . .

6

commerce" is "controlled and defined by reference to the enumerated categories of workers which are recited just before it." *Id*. at 115. Unsurprisingly, the categories of "seamen" and "railroad employees" have historical meaning informing the scope of the § 1 exemption and underscoring Congress's understanding of its legislative authority to regulate commerce at the time of the FAA.

Take "seamen," commonly understood as any "sailor" or "mariner"[5] who "assists in managing ships at sea."[6] It was also "a maritime term of art" with an "established meaning" when Congress enacted the Jones Act in 1920,[7] providing "a

---

[5] *Seaman*, Laird & Lee's Webster's New Standard Dictionary of the English Language 316 (1925).

[6] *Seaman*, Webster's Collegiate Dictionary 870 (3d ed. 1925). *See also Seaman*, Black's Law Dictionary (11th ed. 2019) ("(bef. 12c) . . . a person who is attached to a navigating vessel as an employee below the rank of officer and contributes to the function of the vessel or the accomplishment of its mission.").

[7] The "Jones Act" is the Merchant Marine Act of 1920, Pub. L. 66-261, 41 Stat. 988. The Jones Act did not define "seaman" because "Congress intended the term to have its established meaning under the general maritime law at the time the Jones Act was enacted." *Chandris, Inc. v. Latsis*, 515 U.S. 347, 355 (1995). And general maritime law had long recognized a seaman as "a mariner of any degree, one who lives his life upon the sea," including both masters and crewmen, *Warner v. Goltra,* 293 U.S. 155, 157 (1934), or more specifically a "person . . . employed on board a vessel in

---

7

cause of action in negligence for 'any seaman' injured 'in the course of his employment.'" *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342 (1991);[8] *Warner v. Goltra,* 293 U.S. 155, 157–59 (1934). Likewise, "railroad employees," a term encompassing workers "engaged in the customary work directly contributory to the operation of the railroads." *New Prime*, 139 S. Ct. at 543 & n.11, n.12 (citing *Railway Employees' Dept., A.F. of L. v. Indiana Harbor Belt R. Co.*, Decision No. 982, 3 R.L.B. 332, 337 (1922) and Erdman Act, Act of June 1, 1898, ch. 370, 30 Stat. 424). So by the arrival of the FAA, both "seamen" and "railroad employees" were already defined by Congress.

And those definitions included procedures for resolving disputes. Congress addressed arbitration of seamen's claims in the Shipping Commissioners Act of 1872, ch. 322, §§ 25–26, 17 Stat. 262, 267, *see Circuit City*, 532 U.S. at 121, while the Jones Act of 1920 provided "heightened legal protections (unavailable to other maritime workers) that seamen receive because of their exposure to the perils of the sea," and their "peculiar relationship to the vessel." *Chandris, Inc. v. Latsis*, 515 U.S. 347, 354–55 (1995) (internal quotations omitted). That excluded "land-based maritime workers" who instead enjoyed protection under the Longshore and Harbor Workers' Compensation Act of 1927. *Wilander*, 498 U.S. at 347–48; *Shade v. Great Lakes Dredge & Dock Co.*, 154 F.3d 143, 147–

---

furtherance of its purpose." *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 346 (1991).

[8] *McDermott* is quoting 46 App. § 688, recodified at 46 U.S.C. § 30104. *See* Pub. L. 109-304, § 6(c), 120 Stat. 1485, 1510 (2006).

8

48 (3d Cir. 1998). Simply summarized, Congress exempted seamen from the Longshore and Harbor Workers' Compensation Act because they "preferred the remedy for damages under the [Jones Act]." *Warner*, 293 U.S. at 159–60.

"Railroad employee" disputes were addressed by Congress in the Transportation Act of 1920, Pub. L. No. 152, 41 Stat. 456 *et seq.*, and then, "endeavor[ing] to establish a more practicable plan" to manage railroad labor relations, in the Railway Labor Act ("RLA") of 1926. *Tex. & New Orleans R. Co. v. Bhd of Ry. Clerks,* 281 U.S. 548, 560–63 (1930). The RLA defined "employees" to include "every person in the service of a carrier (subject to its continuing authority to supervise and direct the manner of rendition of his service) who performs any work defined as that of an employee or subordinate official in the orders of the Interstate Commerce Commission." Railway Labor Act, § 1, Pub. L. No. 257, 44 Stat. 577 (1926) (codified at 45 U.S.C. § 151).[9] Not fifteen years later, Congress amended the RLA to clarify the bounds of "employees," adding that "the term 'employee' shall not include any individual while such individual is engaged in the physical operations" related to coal mining, preparation, and handling. Pub. L. No. 764, 54 Stat. 785, 786 (1940). Those definitions, largely unchanged today, referred only to a person

---

[9] The definition of "employee" incorporates the definition of "carrier," which refers to "any express company, sleeping-car company, and any carrier by railroad . . . including all floating equipment such as boats, barges, tugs, bridges and ferries; and other transportation facilities used by or operated in connection with any such carrier by railroad. . . ." Pub. L. No. 257, 44 Stat. 577 (1926).

within the railroad industry. *See New Prime*, 139 S. Ct. at 543 & n.11, n.12.[10]

All this to say that "seamen" and "railroad employees" were not random examples of the industries exempted from the FAA. Rather, they are specific classes of workers already subject to complex dispute-resolution schemes. The common key between both is "workers over whom the commerce power was most apparent." *Circuit City*, 532 U.S. at 120. Congress tied the exception in § 1 not to a general notion of commercial conduct, or even transportation in general, but to the kinds of

---

[10] That understanding tracks the text of the statute, as "railroad" was understood to refer to "transport by train." *Railroad*, Black's Law Dictionary (11th ed. 2019) (definition of "railroad" dating to 1838); *see also Railroad*, Bouvier's Law Dictionary (8th ed. 1914) ("A railroad company is defined as an association of men who engage in the business of hauling passengers and freight.") It also follows judicial interpretations of railroad-related statutes. *See generally Wells Fargo & Co. v. Taylor*, 254 U.S. 175, 187–88 (1920) (discussing the differences between a common carrier and an express company conducting business on, but not operating, a railroad and concluding the latter was not a "common carrier by railroad" under the Employers' Liability Act of 1908); *see also Edwards v. Pac. Fruit Express Co.*, 390 U.S. 538, 540–41 (1968) (characterizing the list of businesses found in the RLA definition of "carriers" (express companies, sleeping-car companies, carriers by railroad) to encompass "activities and facilities intimately associated with the business of common carrier by railroad").

10

transportation work within "Congress' undoubted authority to govern." *Id.* at 120. Having already passed laws to address the disputes of these industries uniquely within the Article I, § 8 commerce power, Congress understandably exempted those same transportation workers from the new FAA "for the simple reason that it did not wish to unsettle established or developing statutory dispute resolution schemes covering specific workers." *Id.* at 121. *Tenney* fights that narrow construction and, in adding those who "work so closely related" to the class of rail and sea workers identified, also runs into the limits on Congress's legislative authority over commerce.[11]

## 2. The FAA Exemption Focuses on Class

Informed by history, and framed in context of the entire FAA, *Tenney's* expansive reach is difficult to square with the limits on Congress's commerce power and the "narrow

---

[11] When the FAA was adopted, the Commerce Clause was seen as "a limit on state legislation that discriminated against interstate commerce." *United States v. Lopez*, 514 U.S. 549, 553 (1995); *see also id.* at 554 (citing *Wickard v. Filburn,* 317 U.S. 111, 121 (1942)). It was not until the watershed case of *NLRB v. Jones & Laughlin Steel Corp.* that the Court held that intrastate activities that "have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions" are within Congress's regulatory power. 301 U.S. 1, 37 (1937). The understanding of interstate commerce before *Jones & Laughlin* would not have been as broad as the *Tenney* formulation.

11

construction" of the § 1 exemption repeatedly, and recently, provided by the Supreme Court. *Circuit City*, 532 U.S. at 118; *see also Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 800–02 (7th Cir. 2020); *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904, 931–33 (9th Cir. 2020) (Bress, J., dissenting). So what is the best reading of § 1? The answer appears in the text: whether a "class of workers," not any individual worker, is "engaged in foreign or interstate commerce" as an ordinary and regular part of the class of work. That turns our focus away from the kind of businesses to the class of workers employed by the firm engaged in interstate or foreign commerce. True, tricky questions about some worker classes may persist. But those questions should focus on the *class* of work performed, rather than the function of individual workers or the scope of a company's operations.

That focus on "class," not individual work, follows from the residual clause, which the Supreme Court told us should be "controlled and defined by reference to the enumerated categories of workers which are recited just before it." *Circuit City*, 532 U.S. at 115. We are then instructed to apply *ejusdem generis*, *id.* at 114, to find the sorts of workers who are like "seamen" and "railroad employees": the Court called them "transportation workers." *Id.* at 119.

To figure out who is a "transportation worker," we must ask whether a plaintiff is in the class of workers "actually engaged in the movement of goods in interstate commerce." *Id.* at 112. Section 1 should apply, then, to employment contracts of a class of workers "actually engaged in the movement of goods in interstate commerce in the same way that seamen and railroad workers are." *Asplundh Tree Expert Co. v. Bates*, 71 F.3d. 592, 601 (6th Cir. 1995). Is the interstate movement of goods a "central part of the class members' job

12

description"? *Wallace*, 970 F.3d at 801. Does the class of workers operate "in a cross-boundary capacity" the way seamen and railroad workers do? *Rittman*, 971 F.3d at 927 (Bress, J., dissenting).

These are the questions to ask under an ordinary reading of the statute. Questions that *Tenney* takes out of the equation in favor of an examination of work in general. Respectfully, it is appropriate to reconsider that result before businesses serving wine connoisseurs, pizza lovers, Etsy enthusiasts, and home shoppers all find themselves redefined as sailors. A result avoided by the best reading of § 1.

## II.     CONCLUSION

Returning the FAA to its original meaning will likely displease those hoping to avoid the courtrooms where judges and juries have resolved disputes since the Founding. Nor will it satisfy those looking to exempt ever-more employees from arbitration. Enforcing rather than editing laws does not always please every crowd. *See* Lawrence B. Solum, Surprising Originalism: The Regula Lecture, 9 ConLawNOW 235, 256–57 (2018). It does, however, give everyone fair notice of the rules. Perhaps the time has come for a different approach to arbitration than the framework Congress created in 1926. If so, that change must come from Congress. While that question is considered, respectfully, courts can return the FAA to its ordinary meaning and give ordinary workers the benefits and obligations of arbitration written into law.

SHWARTZ, J., dissenting.

Robert Harper delivered packages for Amazon. Delivery drivers like Harper operated under a "Terms of Service" agreement ("TOS"). Section 11 of the TOS was entitled "Arbitration Agreement." It provided, among other things, that the driver and Amazon would resolve disputes through "final and binding arbitration." App. 62 (capitalization omitted). The parties further "agree[d] that the Federal Arbitration Act ["FAA"] and applicable federal law will govern any dispute that may arise between the parties." App. 67. Section 12 had a separate choice of law provision that applied to the remainder of the TOS. It stated that the TOS is "governed by the law of the state of Washington without regard to its conflict of laws principles, except for [the arbitration provision] . . . which is governed by the [FAA] and applicable federal law." App. 67. Thus, the TOS contemplated that federal law would govern the arbitration provision.

Harper filed a complaint alleging that Amazon violated the New Jersey wage and hour laws. In response, Amazon moved to compel arbitration based on federal and state law. The District Court examined the TOS, observed that the FAA "govern[ed] all disputes related to arbitration," App. 18, and attempted to determine whether Harper is a member of a class of workers that are exempt from the FAA under § 1's residual clause, 9 U.S.C. § 1. Because the pleadings lacked sufficient facts to determine whether the FAA applied, the District Court ordered limited discovery on this issue, consistent with Singh v. Uber Technologies, Inc., 939 F.3d 210 (3d Cir. 2019). The Court further determined that it would decide if the FAA applies before addressing whether Washington or New Jersey law would compel arbitration absent the FAA.

1

My colleagues agree that the District Court properly applied Singh but say that the Court erred in allowing discovery to proceed before deciding whether state law would compel arbitration. As a result, they have vacated the Court's order and directed it to examine what could be tricky state law issues[1] before even determining that the parties' chosen federal law does not apply. While I fully understand the goals of arbitration and the desire to expeditiously resolve cases, compelling arbitration here is possible only because of the parties' contract, which itself provides that the FAA governs the arbitration provision. Because the District Court followed the plain language of that contract and faithfully applied binding precedent, there is no reason to require the Court to examine state law at this point. As a result, I respectfully dissent for three reasons.

---

[1] The two Courts of Appeals that have examined the same contract reached different conclusions on what state's law, if any, applies to the arbitration provision absent application of the FAA. Compare Rittmann v. Amazon.com, Inc., 971 F.3d 904, 920-21 (9th Cir. 2020) (concluding, after determining that Amazon Flex drivers are exempt from the FAA, that there was no agreement to arbitrate under state law and thus "there is no [state] law that governs the arbitration provision"), cert. denied, 141 S. Ct. 1374 (2021) (Mem.), with Waithaka v. Amazon.com, Inc., 966 F.3d 10, 26-35 (1st Cir. 2020) (concluding, after determining that Amazon Flex drivers are exempt from the FAA, that Washington law applies to the arbitration provision, and then conducting a conflicts-of-law analysis between Washington law and the law of the forum state, Massachusetts, and applying the forum's law), cert. denied, --- S. Ct. ----, No. 20-1077, 2021 WL 2519107 (U.S. June 21, 2021).

First, the TOS's arbitration provision states that the parties will resolve disputes through arbitration under the FAA and applicable federal law. Importantly, the TOS's choice of law clause disclaims the applicability of Washington law to arbitration issues and repeats that the FAA governs the TOS's arbitration provision. The District Court's decision to first determine whether the FAA applies appropriately sought to effectuate the plain language of the agreement, a core tenet of common law contractual interpretation. See Pacifico v. Pacifico, 920 A.2d 73, 77 (N.J. 2007); Berg v. Hudesman, 801 P.2d 222, 226 (Wash. 1990).[2] To do otherwise would be contrary to the agreement's clear text.[3]

Second, binding precedent supports the sequence that the District Court followed by first seeking to determine whether the parties' chosen law, here, the FAA, applies. Start with New Prime Inc. v. Oliveira, 139 S. Ct. 532 (2019). There, the Supreme Court examined whether a delegation clause permits an arbitrator to decide whether the FAA applies, i.e., whether the class of workers is exempt from the FAA under § 1. The Court held that the applicability of an exemption is an "antecedent question" and specifically stated that "a court should decide for itself whether § 1's . . . exclusion applies

---

[2] Because the parties dispute whether, absent application of the FAA, New Jersey or Washington law may apply to the arbitration provision, I cite both Washington and New Jersey law.

[3] Additionally, even if ambiguous, any ambiguities in the contract are construed against the drafter, here, Amazon. See, e.g., Dennis v. Great Am. Ins. Co., 503 P.2d 1114, 1117 (Wash. Ct. App. 1972); see also Rittmann, 971 F.3d at 920 (construing this ambiguity against Amazon).

3

before ordering arbitration." Id. at 537. The Court further stated that "before invoking the severability principle, a court should determine[] that the contract in question is within the coverage of the" FAA. Id. at 538 (alteration in original and quotation marks and citations omitted).[4] Thus, New Prime teaches that if the parties have selected the FAA as the governing law, a court should first examine whether it applies before turning to state law.

Relying on New Prime, we have reached the same conclusion. In Singh, the parties, like the parties here, entered an agreement that "state[d] that the FAA would govern" the arbitration agreement. 939 F.3d at 216. Based on that choice and the lean factual record, we determined that we would "leave it to the District Court to address" arguments challenging arbitration and the applicability of state law "once it determines whether the FAA applies." Id. at 228. Thus, New Prime and Singh instruct that, where the parties have selected

---

[4] The agreement in New Prime provided that it was governed by Missouri law and that the parties agreed to arbitrate disputes "in accordance with Missouri's Arbitration Act and/or the Federal Arbitration Act." Oliveira v. New Prime, Inc., 141 F. Supp. 3d 125, 128 (D. Mass. 2015). Despite this language, New Prime sought to compel arbitration under the FAA. See Oliveira v. New Prime, Inc., 857 F.3d 7, 11 (1st Cir. 2017) ("[New] Prime moved to compel arbitration under the FAA and stay the proceedings."). The fact that the movant relied on only federal law does not appear to have impacted the Supreme Court's pronouncements about the FAA. See, e.g., New Prime, 139 S. Ct. at 537 ("[A] court should decide for itself whether § 1's 'contracts of employment' exclusion applies before ordering arbitration.").

4

the FAA as the law that governs arbitration, the court should first review whether the FAA covers the relevant class of workers.[5]

We have applied the same approach even where the parties agree that the FAA and/or a specific state's law governs. In Palcko v. Airborne Express, Inc., 372 F.3d 588 (3d Cir. 2004), for instance, the parties entered an agreement that stated the FAA "shall govern the interpretation, enforcement, and all proceedings pursuant to this Agreement. To the extent that the [FAA] is inapplicable, Washington law pertaining to agreements to arbitrate shall apply." Id. at 590. In Palcko, we followed the agreement, which required us to first examine the applicability of the FAA, and we concluded based upon the type of tasks performed that the worker was exempt under § 1. Id. at 593-94. We then explained that since the FAA does not preempt application of state arbitration law, we would, consistent with the contract's text, next examine state law. Id. at 595-96. Thus, we endorsed determining whether the FAA

---

[5] The majority asserts that the issue of sequencing was not addressed in Singh. They first cite to a part of the Singh majority that discussed the sequence of considering various sources of factual material. See 939 F.3d at 227-28. They then cite to the concurrence's disagreement with the sequence— addressing the FAA's applicability first—that the Singh majority endorsed. See 939 F.3d at 231 (Porter, J., concurring). Thus, it is not accurate to say Singh does not address sequencing.

applies before proceeding to state law, noting that "the effect of [the exemption in FAA §] 1 is merely to leave the arbitrability of disputes . . . as if the [FAA] had never been enacted." Id. at 596 (quoting Mason-Dixon Lines, Inc. v. Local Union No. 560, 443 F.2d 807, 809 (3d Cir. 1971)).  Hence, Palcko also shows that the District Court correctly addressed the FAA issue before examining state law.

Third, two circuit courts have evaluated the very agreement at issue in this case and each first examined, albeit without discovery, whether the FAA applies or whether employees holding jobs like Harper belong to a class of workers exempt from the FAA.  See Rittmann v. Amazon.com, Inc., 971 F.3d 904, 915-19 (9th Cir. 2020), cert. denied, 141 S. Ct. 1374 (2021) (Mem.); Waithaka v. Amazon.com, Inc., 966 F.3d 10, 17-26 (1st Cir. 2020), cert. denied, --- S. Ct. ----, No. 20-1077, 2021 WL 2519107 (U.S. June 21, 2021).  Once again, given the TOS's language, our sister circuits first considered whether the parties' chosen law—the FAA—applied before turning to state law.

The District Court, relying on and acting in accordance with this body of authority, followed suit.  It correctly examined the agreement, observed that the agreement exclusively selected the FAA as the law that applied to the arbitration provision, sought to determine whether the FAA governed the class of workers to which Harper belongs, concluded that the factual record was insufficient to make such a conclusion, ordered the parties to engage in limited discovery consistent with Singh, and declined to reach whether or which state law applied pending resolution of whether the expressly selected law—the FAA—governed.  Because the District Court's ruling fully comported with the plain language of the

6

parties' agreement and the binding precedent, I would affirm
in all respects.